# Illinois Official Reports

## Supreme Court

---

**People v. Cummings, 2014 IL 115769**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DERRICK A. CUMMINGS, Appellee. |
| Docket No. | 115769 |
| Filed | March 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | What was otherwise a valid traffic stop should not have been prolonged by a request for the driver's license after the initial reasons for the stop had evaporated—suppression upheld as to charge of driving on a suspended license. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Whiteside County, the Hon. John L. Hauptman, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Trish Joyce, State's Attorney, of Morrison (Michael A. Scodro, Solicitor General, and Michael M. Glick and Eldad Z. Malamuth, Assistant Attorneys General, of Chicago, and Patrick Delfino, Terry A. Mertel and Richard T. Leonard, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Peter A. Carusona, Deputy Defender, and Sean Conley, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee. |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion. Justices Freeman, Kilbride, Karmeier, and Burke concurred in the judgment and opinion. Chief Justice Garman dissented, with opinion, joined by Justice Thomas. |

## OPINION

¶ 1     The narrow issue in this case is whether a police officer violated the fourth amendment when, after stopping a van solely because it was registered to a woman with an outstanding arrest warrant, he asked the male driver for a driver's license. For the reasons that follow, we affirm the judgment of the appellate court, which affirmed the circuit court of Whiteside County's decision to grant defendant Derrick Cummings' motion to suppress evidence. 2013 IL App (3d) 120128.

¶ 2                                    BACKGROUND

¶ 3     On January 27, 2011, the defendant received a citation for driving while license suspended. 625 ILCS 5/6-303(d) (West 2010). The State later charged him by information with that offense, a Class 4 felony. The defendant filed a motion to suppress evidence.

¶ 4     At the hearing on that motion, the defendant testified that on the evening he was ticketed, he was driving a van owned by a woman named Pearlene Chattic on a four-lane road in the City of Sterling. A marked police squad car pulled alongside the van at a stop sign. The defendant proceeded through the intersection, and the police officer followed him for several minutes before activating the squad car's lights. According to the defendant, he had not violated any traffic laws. The citations that he received were unrelated to the movement or the condition of the van.

¶ 5     Officer Shane Bland of the Sterling Police Department testified that on the evening the defendant was ticketed, he was on patrol when he encountered a van driving in front of his

squad car. According to Officer Bland, "It appeared that the registration on the vehicle had expired." Officer Bland checked the van's registration. He learned that the registration was valid, but also that the van's owner, Chattic, was "wanted on a warrant." Officer Bland pulled next to the van at a stop sign and attempted to identify the driver as Chattic, but "the driver pinned themselves [*sic*] back in the seat," obstructing his view. He was unable to determine whether the driver was a woman or a man.

¶ 6    Officer Bland testified that the driver proceeded through the intersection, and he activated his squad car's emergency lights. Officer Bland exited the squad car and approached the van. Before he spoke to the driver, he determined that the driver was a man. Officer Bland stated that he asked the defendant for a driver's license and proof of insurance and he explained why he stopped the van. The defendant had no license. If he had produced a license and proof of insurance, Bland would have let him go. According to Officer Bland, asking for a license and proof of insurance is "standard operating procedure" when a car has been curbed.

¶ 7    On cross-examination by defense counsel, Officer Bland testified that he knew Chattic was a woman. Officer Bland acknowledged that his written report of the incident indicated as he pulled next to the van, its driver looked at him. He insisted, however, that he could not see the driver's face. Officer Bland stated that the only reason he stopped the van was Chattic's arrest warrant. He did not observe any other violations of law by the driver or the van. Officer Bland repeated that before he spoke to the driver, he determined the driver was a man. Bland first requested a driver's license and proof of insurance as a matter of routine. After the defendant said he did not have a license, Officer Bland explained the reason for the stop.

¶ 8    The trial court granted the motion. The court stated that here the facts were not disputed, but the issue was complicated by the applicable case law. The court observed:

"[T]his was easy, *** this was not because [Officer Bland] *** saw a traffic violation, this was not because he thought that [the defendant] was somebody who was wanted. This was really simple. He was looking for Pearlene Chattic and he clearly can see this is not Pearlene Chattic. And I commend him for not trying to sugar coat that at all *** because he just said, *** I could tell right away it wasn't her.

    *** [O]nce he makes that determination on a very simple reason for the stop, I think going anywhere further with that, without further explanation to an individual who *** clearly had to believe that he was not free to leave, I think that's going one step [beyond]."

After the trial court denied the State's motion to reconsider, the State appealed pursuant to Rule 604. Ill. S. Ct. R. 604 (eff. July 1, 2006).

¶ 9    The appellate court affirmed. 2013 IL App (3d) 120128. The court initially noted the parties did not dispute that the purpose of the stop—determining whether the driver of the van was Chattic—was initially lawful, but only that the request for the defendant's license after that purpose dissipated violated the fourth amendment. *Id.* ¶ 11. The appellate court stated, "Although it may be common protocol for police to request a person's driver's license anytime a motorist has been lawfully stopped, that request must be analyzed through the lens of constitutional reasonableness, mindful that a lawful seizure can become unlawful if it is prolonged beyond the time needed to complete the stop." *Id.* ¶ 12 (citing *Illinois v. Caballes*, 543 U.S. 405 (2005), and *People v. Harris*, 228 Ill. 2d 222 (2008)). The court continued, "Except where there is articulable and reasonable suspicion that a motorist is unlicensed or the

- 3 -

vehicle is unregistered, or that either the motorist or vehicle is in violation of the law, stopping and detaining a motorist in order to check his credentials is unreasonable under the fourth amendment." 2013 IL App (3d) 120128, ¶ 12 (citing *Delaware v. Prouse*, 440 U.S. 648 (1979)). Here, as soon as Officer Bland determined that Chattic was not the driver of the van, any reasonable suspicion of criminal activity vanished, and seizure became unlawful because there was no longer a fourth amendment justification for the stop. 2013 IL App (3d) 120128, ¶ 13. The appellate court discussed *People v. Bradley*, 292 Ill. App. 3d 208 (1997), upon which the State relied, and concluded it was wrongly decided. 2013 IL App (3d) 120128, ¶ 14.

¶ 10      Justice Wright dissented. Justice Wright insisted that a police officer may approach a driver to explain the basis for a traffic stop and to request the driver's license, even after reasonable suspicion has dissipated. *Id.* ¶ 24 (Wright, P.J., dissenting) (citing *People v. Hernandez*, 2012 IL App (2d) 110266, ¶ 5, citing *Bradley*, 292 Ill. App. 3d at 211). Justice Wright reasoned that Officer Bland was justified in detaining the defendant very briefly to insure he had a valid license and could lawfully drive away. 2013 IL App (3d) 120128, ¶ 24 (Wright, P.J., dissenting). According to Justice Wright, Bland did not unduly prolong the stop by quickly asking the defendant to identify himself. *Id.* ¶ 25 (citing *People v. Safunwa*, 299 Ill. App. 3d 707, 714 (1998)).

¶ 11      We granted the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010).

¶ 12                                        ANALYSIS

¶ 13      In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). A trial court's fact findings should be reviewed only for clear error, and will be reversed only if they are against the manifest weight of the evidence. *Id.* But where, as here, those facts are not disputed, the trial court's ultimate ruling that suppression was warranted should be reviewed *de novo. Id.*

¶ 14      The legal principles that guide our analysis in this case are familiar and well-established. The fourth amendment to the United States Constitution, which applies to the States under the fourteenth amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; *Elkins v. United States*, 364 U.S. 206, 213 (1960); see also Ill. Const. 1970, art. I, § 6. That amendment safeguards individuals from arbitrary government action, and generally requires a warrant supported by probable cause. *People v. Jones*, 215 Ill. 2d 261, 269 (2005) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

¶ 15      However, the United States Supreme Court has recognized exceptions to the warrant requirement in cases involving diminished expectations of privacy or minimal intrusions on privacy, where a warrantless search or seizure may be reasonable. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). Such cases include traffic stops. Traffic stops are certainly seizures under the fourth amendment (*Whren v. United States*, 517 U.S. 806, 809-10 (1996); *People v. Bunch*, 207 Ill. 2d 7, 13 (2003)), but they are less like formal arrests, and more like investigative detentions (*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Accordingly, the reasonableness of a traffic stop is gauged by the standard in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a police officer may briefly detain and question a person if the officer reasonably believes that person has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22; see also 725 ILCS 5/107-14 (West 2010). Such a detention is reasonable if it was initially

justified, and if it was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (holding "the stop and inquiry" must both be related in scope to the justification for their initiation). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). A traffic stop that is initially justified "can become unlawful 'if it is prolonged beyond the time reasonably required' to complete the purpose of the stop." *Harris*, 228 Ill. 2d at 239 (quoting *Caballes*, 543 U.S. at 407); see *Hernandez*, 2012 IL App (2d) 110266, ¶ 5 ("an investigative stop that is originally lawful must cease once reasonable suspicion dissipates").

¶ 16 As we stated in *Harris*, mere police questioning does not constitute a seizure under the fourth amendment. *Harris*, 228 Ill. 2d at 241 (quoting *Muehler v. Mena*, 544 U.S. 93, 101 (2005), quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)); accord *People v. McKnight*, 198 Ill. App. 3d 530, 533 (1990) ("it is not necessary for a police officer to have probable cause to request production of a driver's license and \*\*\* such a request does not create an illegal seizure"). This, however, does not end our analysis because "we must consider the possibility, not that each question is a 'seizure,' but that questioning may render the physical detention unreasonable." (Emphasis omitted.) *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002). That is, questioning is not irrelevant in determining whether the detention has exceeded its lawful duration: "In a garden variety *Terry* stop, the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). In this regard, *Caballes* is instructive.

¶ 17 In *Caballes*, the defendant was stopped for speeding on an interstate highway. After the state trooper who initiated the stop radioed the dispatcher to report his activity, another state trooper, a member of the state police drug interdiction team, headed for the location of the stop with a narcotics-detection dog. While the first trooper wrote the defendant a warning ticket, the second trooper walked the dog around the defendant's car. The dog alerted the second trooper regarding the presence of drugs in the trunk. The defendant was arrested for a drug offense. He filed a motion to suppress evidence. The trial court denied that motion, and convicted the defendant. The appellate court affirmed that decision. *People v. Caballes*, 321 Ill. App. 3d 1063 (2001) (table) (unpublished order under Supreme Court Rule 23). This court reversed, holding that the canine sniff was performed in the absence of any specific and articulable facts suggesting drug activity, so the use of the dog unjustifiably enlarged the scope of a routine traffic stop into a drug investigation. *People v. Caballes*, 207 Ill. 2d 504 (2003).

¶ 18 The Supreme Court reversed. The Court noted that the initial seizure was based on probable cause to believe that the defendant was speeding, and concededly lawful. The Court further noted:

> "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. [Citation.] A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407.

In rejecting our analysis, the Court accepted the trial court's conclusion that "the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at 408.

- 5 -

¶ 19    *Caballes* links the reasonableness of a traffic stop's duration to the reason for the stop. See *Harris*, 228 Ill. 2d at 235-36. But the reason for the stop varies from case to case. Though a police officer's request for a driver's license may be an expected, preliminary, and routine part of virtually every traffic stop (see *United States v. Johnson*, 680 F.3d 966, 974-75 (7th Cir. 2012)), it defies *Caballes*, and *Terry*, to suggest that "standard operating procedure" for most traffic stops is necessarily constitutionally permissible in all stops. The State is correct in its observation that the fourth amendment does not draw a bright line forbidding all police actions that could prolong a traffic stop even momentarily. But neither does it draw a bright line allowing such actions as a matter of course. Because our analysis under *Terry* focuses on reasonableness under the circumstances (see *People v. Sorenson*, 196 Ill. 2d 425, 441 (2001)), those circumstances dictate what inquiries are reasonable. To pass constitutional muster, a request for identification must be tethered to, and justified by, the reason for the stop. See *Terry*, 392 U.S. at 19 (holding that the length and scope of the detention "must be strictly tied to and justified by the circumstances which rendered its initiation permissible") (internal quotation marks omitted); *Royer*, 460 U.S. at 500 ("The scope of the detention must be carefully tailored to its underlying justification.").

¶ 20    Here, Officer Bland had reasonable suspicion that the van's registration was expired, but that suspicion disappeared when he conducted a computer check. The check, however, revealed the outstanding arrest warrant for Chattic, the registered owner of the van, whom Bland knew was a woman. Officer Bland could not determine whether the driver of the van was a woman, so he had reasonable suspicion that the driver was subject to seizure. That suspicion, like the first, disappeared when he saw that the defendant was not a woman and, therefore, could not be Chattic. Requesting the defendant's license impermissibly prolonged the stop because it was unrelated to the reason for the stop.

¶ 21    We find the reasoning in *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994) persuasive. There, a police officer saw a vehicle with no front or rear license plate, but a temporary registration sticker in the rear window. The officer was unable to read the sticker, so he stopped the vehicle to verify the validity of the sticker. As he approached the vehicle, the officer observed that the sticker was valid, but he spoke to the driver and requested identification from the driver and a passenger. The driver did not have a license, but he provided other identification. The officer conducted a computer search and learned that the driver had a suspended license and a prior record of drug and gun violations. The officer returned to the vehicle, questioned the driver about his travel plans, and asked for consent to search. The subsequent search of the vehicle's trunk revealed drugs and a gun. The driver filed a motion to suppress, which the trial court denied. He pleaded guilty to various drug and gun offenses.

¶ 22    The federal court of appeals reversed, holding that the initially valid stop evolved into an unreasonable detention because once the officer saw that the sticker was valid, the purpose of the stop was satisfied and further detention to question the driver about his itinerary and to request his license and registration "exceeded the scope of the stop's underlying justification." *Id.* at 561. The court noted that while other cases from that circuit had held that an officer conducting a routine traffic stop may inquire about identity and travel plans, those cases were inapposite; they involved "situations in which the officer, at the time he or she asks question or requests the driver's license and registration, still has some 'objectively reasonable articulable suspicion' that a traffic violation 'has occurred or is occurring.' " *Id.* (quoting *United States v.*

*Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993)). Because the officer's reasonable suspicion regarding the validity of the sticker was "completely dispelled *prior* to the time" he questioned the driver and requested his license, he lacked reasonable suspicion to prolong the detention. (Emphasis in original.) *Id*. at 561-62.

¶ 23     *Safunwa*, a case from our appellate court, provides apt contrast. In that case, a federal marshal was searching for a fugitive with an outstanding arrest warrant for heroin distribution. The marshal had never personally seen the fugitive, but he did have a photograph of him. During surveillance, the marshal observed a vehicle whose driver matched the approximate height, weight, and age of the fugitive. The marshal followed the vehicle for approximately half an hour, and eventually pulled next to the vehicle to get a closer look at the driver. Based upon this observation, the marshal believed the driver was the fugitive. Although neither the driver nor the vehicle was in apparent violation of any traffic laws, the marshal curbed the vehicle and asked the driver for his license. The driver handed the marshal a citation bearing his name, and not the fugitive's name. The marshal conducted a computer search of the driver's identity, which revealed that the driver's license had been suspended. The driver was arrested and charged with driving on a suspended license. A subsequent search at the police station produced drug evidence. The driver filed a motion to suppress, and the trial court denied the motion.

¶ 24     The appellate court affirmed, holding that the marshal was justified in not only stopping the vehicle, but also requesting the driver's identification. *Safunwa*, 299 Ill. App. 3d at 711. The court, relying on cases holding that requests for identification during traffic stops are permissible, still correctly reasoned that the similarity between the driver and the fugitive rendered the request in that case constitutionally permissible. *Id.* Unlike the driver in *Safunwa*, the defendant here bore no superficial resemblance to the subject of the arrest warrant.

¶ 25     The State asserts that Officer Bland asked only for basic documentation that all Illinois drivers are required to carry. See 625 ILCS 5/6-112 (West 2010) (requiring licensed drivers to keep their licenses in their immediate possession while operating motor vehicles and to display those licenses upon demand by law enforcement officials).[1] The State insists that the request was brief, minimally intrusive, and related vaguely to officer safety, so it was reasonable under the totality of the circumstances. But the State offers little else in the way of constitutional analysis, and instead points out that requests for identification have been upheld in several closely analogous cases, including *Hernandez*, *Bradley*, and *People v. Bartimo*, 345 Ill. App. 3d 1100 (2004).

¶ 26     Those cases do stand for the proposition that a police officer may always request identification during a traffic stop, even after reasonable suspicion evaporates. See also, *e.g.*, *People v. Ortiz*, 317 Ill. App. 3d 212, 220 (2000) (stating, without citation, that "[w]hen a police officer is engaged in a minor traffic stop, he may briefly detain the driver to request a valid driver's license"); *People v. Koutsakis*, 272 Ill. App. 3d 159, 163 (1995); *People v. Jennings*, 185 Ill. App. 3d 164, 169 (1989). Some federal appeals courts, as well as courts in other states, have adopted a similar rule. See, *e.g.*, *United States v. Peralez*, 526 F.3d 1115,

---

[1]The State does not argue that the defendant violated section 6-112, or that, if he did, that offense provided Officer Bland with new reasonable suspicion to extend the stop. Accordingly, we need not address the relevance of that statute to the issue here.

1119 (8th Cir. 2008) ("During a traffic stop, an officer may detain the occupants of the vehicle 'while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation,' " including requesting the driver's license.); *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) ("An officer conducting a routine traffic stop may request a driver's license and vehicle registration ***."); *State v. Candelaria*, 245 P.3d 69, 75 (N.M. App. 2010) ("As long as the vehicle has been validly stopped, for whatever reason, police may always ask the driver to produce" license, registration, or insurance documents, "even after the original suspicion evaporates," because the driver has no legitimate expectation of privacy in such documents.). But such a broad rule, however attractive in its simplicity and valuable in its potential to detect crime, stands on weak constitutional footing. Simply put, unless a request for identification is related to the reason for the stop, it impermissibly extends the stop and violates the Constitution. To the extent Illinois appellate court cases, including *Hernandez*, *Bradley*, and *Bartimo*, hold otherwise, they are overruled.

¶ 27 We note in closing that the State does not contend this was a consensual encounter. Officer Bland asked for the defendant's license, registration, and proof of insurance before he informed the defendant of the reason for the stop, and he never gave the defendant an "all clear." See *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006). Of course, a police officer need not inform a driver that he or she is free to leave before making further inquiries. See *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996); but see *People v. Adams*, 225 Ill. App. 3d 815, 819 (1992) (holding that, once a police officer determined that a defendant's temporary registration was valid, "it just naturally follows" that the officer would "approach the defendant, explain the reason for the stop, apologize, and advise defendant he was free to leave"). But something must occur to terminate a traffic stop that has lost its justification and become unlawful before we can analyze any inquiries as consensual.

¶ 28 Our holding is limited to the facts in this case. Because Officer Bland lacked reasonable suspicion after he learned the defendant could not be the subject of the outstanding arrest warrant, his request for the defendant's license impermissibly prolonged the stop and violated the fourth amendment.

¶ 29                                        CONCLUSION

¶ 30 For the reasons that we have stated, the judgment of the appellate court is affirmed.

¶ 31 Affirmed.

¶ 32 CHIEF JUSTICE GARMAN, dissenting:

¶ 33 I agree with the majority on much of its analysis and that this case presents a narrow question regarding the permissible bounds of a nonconsensual *Terry*-style traffic stop. The defendant's production of a license was compelled. All of Officer Bland's reasonable suspicions that the driver might have a warrant out for his arrest evaporated when he saw that the defendant was not Pearlene Chattic. Asking for the defendant's license would be prohibited under *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), if it "prolonged [the stop] beyond the time reasonably required" to carry out its initial purpose. But the majority's result complicates law enforcement without any significant analysis of the fourth amendment interest preserved. To reach this result, the majority relies on one Illinois case that is distinguishable on its facts but,

in its reasoning, would counsel the opposite result. *People v. Safunwa*, 299 Ill. App. 3d 707 (1998). The majority also relies on a federal case, *United States v. McSwain*, that precedes the Supreme Court's most recent word on stop-prolonging by eleven years—and which appears to use the very test the Supreme Court struck down in *Caballes*. *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994). Relying on these two unstable footholds, the majority overrules a number of Illinois appellate court cases that reached the opposite result, and the majority largely misses the import of the Supreme Court's ruling in *Caballes*, which this court previously recognized in *People v. Harris*, 228 Ill. 2d 222 (2008).

¶ 34        In *Illinois v. Caballes*, the Supreme Court considered whether a drug-detecting dog sniff of a vehicle stopped for speeding violated the driver's fourth amendment rights. The Supreme Court accepted the conclusion of our courts that "the duration of the stop in this case was entirely justified by the traffic offense and the *ordinary inquiries incident to such a stop*." (Emphasis added.) *Caballes*, 543 U.S. at 408. The Court rejected this court's conclusion that bringing a drug-detecting dog to the scene "impermissibly broadened the scope of the traffic stop *** into a drug investigation." *People v. Caballes*, 207 Ill. 2d 504, 509 (2003). The Supreme Court upheld the dog sniff and subsequent search because the stop was not "prolonged beyond the time reasonably required to complete that mission" of writing a warning ticket. *Caballes*, 543 U.S. at 407.

¶ 35        In *People v. Harris*, this court applied *Caballes* and upheld admission of the fruits of a search incident to the arrest of a passenger. The arresting officer had discovered warrants for the passenger's arrest after asking that passenger for his driver's license. The officer testified that he had asked for the passenger's license so that the passenger might be able to remove the car from the scene, as the vehicle's driver was to be arrested. This court held that a warrant check does not violate the fourth amendment, so long as it does not "unnecessarily prolong[ ]" the stop, and the stop is " 'otherwise executed in a reasonable manner.' " *Harris*, 228 Ill. 2d at 237 (quoting *Caballes*, 543 U.S. at 408). Harris did not argue that the warrant check had unreasonably prolonged the stop. *Id.* at 236. He did argue he did not voluntarily turn over his driver's license, an argument this court rejected on the basis that the defendant-passenger was free to decline the license request even though he could not terminate the encounter. *Id.* at 248-49. This court also recognized that *Caballes* struck down the "fundamental alteration of the nature of the stop" prong this court had adopted for determining if an initially lawful stop had become unlawful. *Id.* at 242. This left only the duration prong intact. *Id.*

¶ 36        Yet in the case at bar, the majority reaches back to 1994, eleven years before the Supreme Court's decision in *Caballes*, to find support in a case that suppressed a search on the grounds it "exceeded the scope of the stop's underlying justification." *McSwain*, 29 F.3d at 561. The *McSwain* court made its decision about the permissible scope of the stop without the benefit of the *Caballes* Court's guidance. In its brief analysis, the *McSwain* court did not make clear whether it made its decision properly on duration or erroneously on the nature of the stop, but it did apply the bright-line rule the majority disclaims. *Supra* ¶ 19 ("[T]he fourth amendment does not draw a bright line forbidding all police actions that could prolong a traffic stop even momentarily."); see *McSwain*, 29 F.3d at 561 ("Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied" and any further inquiries "exceeded the scope of the stop's underlying justification."). Not having the benefit of the *Caballes* decision before it, the *McSwain* court

never considered whether the officer's further actions might qualify as "ordinary inquiries incident to such a stop," nor did it make clear that the officer improperly prolonged the stop.

¶ 37     *McSwain*'s lack of clarity in its mode of analysis and the shift in this area of the law in the intervening years both counsel against relying upon it so strongly. The problem is exacerbated by portions of the majority opinion which suggest continuing vitality for "the nature of the stop," despite its demise in *Caballes*. Under the relevant authorities, the initial purpose of the stop clearly plays a role in defining the permissible duration. But portions of the majority opinion—*e.g.*, "Simply put, unless a request for identification is related to the reason for the stop, it impermissibly extends the stop and violates the Constitution"—appear to reason that Officer Bland's license request was a *per se* prolonging of the stop, which must be impermissible because it was outside the scope of his original purpose. *Supra* ¶ 27. This reasoning is perilously close to a resurrection of the defunct "nature of the stop" prong: if asking for a license is outside the current nature of the stop, then asking for a license is *per se* a prohibited prolonging. *Caballes* amply demonstrates the flaw in such a notion: the dog sniff was completely unrelated to the speeding offense but occurred in parallel time to the issuance of the warning ticket and thus did not prolong the stop.[2] This court should take care to be clear that the "nature of the stop" prong is no longer a part of the test for exceeding the permissible scope of a seizure; it should also take care to avoid relying on cases that may have been decided on that basis. If the court finds the case law on this issue underdeveloped within the state, it should instead look to more recent federal precedent that lacks any indication of having been decided on grounds that have since been held incorrect. See, *e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably* extend the duration of the stop." (Emphasis added.)) (upholding officer's questioning of passenger about gang affiliation); *United States v. Dixie*, 382 F. App'x 517, 519 (7th Cir. 2010) ("In *Childs* we explicitly held that the Fourth Amendment does not require the release of a person from a traffic stop 'at the earliest moment that step can be accomplished.' [Citation.] Instead, '[w]hat the Constitution requires is that the entire process remain reasonable. Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention.' " (quoting *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002))).

¶ 38     The other case on which the majority leans, *Safunwa*, is factually distinguishable from the case at bar regarding the driver's license request. Because Safunwa had the same approximate height, weight, age, hairstyle, and mustache as a wanted fugitive, officers in that case had a justifiable basis to believe the driver might have been the fugitive they were seeking. *Safunwa*, 299 Ill. App. 3d at 709, 711. Accordingly, the officers had sufficient suspicion to request a driver's license. *Id.* The *Safunwa* decision is unremarkable in its resolution that officers can request a driver's license of a driver when they suspect he is a wanted fugitive, and it does not

---

[2] Slightly different facts in this case would also demonstrate the error: if defendant had been traveling with a woman who plausibly might have been Pearlene Chattic, and Officer Bland had been traveling with a fellow officer, *Caballes* would not find a prolonging in Officer Bland asking defendant for his driver's license while a fellow officer asked the female passenger if she was Pearlene Chattic. Officer Bland's license request would be unrelated to the purpose of the stop, but it would not prolong the stop.

substantially guide the outcome of this case, in which Officer Bland has testified he had no suspicion the defendant had committed other crimes.

¶ 39 But the *Safunwa* court's resolution of the other issues confronting it counsels strongly against the majority's result here. Having obtained identification indicating Safunwa was not the fugitive sought, the officers nonetheless carried out a warrant check on the driver's identity. Only on the issue of the warrant check did the *Safunwa* court actually confront the question of whether officers unreasonably deviated from the original scope of the stop. In reviewing that issue, *Safunwa* favorably cited several cases that would uphold the license demand in the present case. *Id.* at 713 ("In both *McKnight* and *Francis*, courts held that police had the right to request production of a driver's license without probable cause and that such a request did not constitute an illegal seizure."); *id.* at 713-14 (analogizing to a court upholding a warrant check after a driver tendered an apparently valid driver's license; noting Idaho, Oregon, and Wisconsin cases allowing such checks). The *Safunwa* court simply concluded that a warrant check of a driver who matched a fugitive in a vague sense was a lesser intrusion under the fourth amendment than requesting a driver's license and checking for warrants without reasonable suspicion. Because the other cases permitted the license request and warrant check, the *Safunwa* court reasoned the warrant check alone was a lesser intrusion. *Safunwa* is, in the light most favorable to the majority's argument, simply distinguishable from the facts in this case. But the cases forming *Safunwa*'s rationale would have upheld this license demand, giving us ample reason to believe the *Safunwa* court would have as well.

¶ 40 Neither *McSwain* nor *Safunwa* should guide this court to this result. *McSwain* is conclusory, dated, and may well have been decided on grounds the Supreme Court has since overruled. *Safunwa* is inapposite on the question of asking for a license but would counsel favorably toward police taking further actions like warrant checks. The majority opinion suffers a dearth of authorities that adequately support its result.

¶ 41 The United States Supreme Court has given previous guidance on the fourth amendment intrusion that can accompany demanding a driver's license without suspicion that a driver is committing a crime or subject to arrest, in *Delaware v. Prouse*, 440 U.S. 648 (1979). *Prouse* is not directly applicable in that it concerns stop initiation, rather than the permissible duration of a stop, but it does provide guidance as to how this court might analyze the fourth amendment intrusion at issue. In *Prouse*, the Supreme Court considered whether a patrol officer could discretionarily stop an automobile solely to check the license status of its driver. There was no probable cause to believe the driver had committed a traffic offense, nor any reason to suspect the driver was subject to seizure for violation of the law. The Court considered contexts in which it had upheld random license checks, contrasting the objective and subjective fourth amendment intrusions in those contexts to the stop at issue. The objective fourth amendment intrusions considered were " 'the stop itself, the questioning, and the visual inspection.' " *Id.* at 656 (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976)). The subjective fourth amendment intrusions considered were " 'the generating of concern or even fright on the part of lawful travelers.' " *Id.* (quoting *Martinez-Fuerte*, 428 U.S. at 558). The Court in *Prouse* assessed the "important ends" of highway safety against the likelihood a spot check would produce results, to determine whether it was a "sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such stops entail." *Id.* at 659. Reasoning that drivers stopped for observed traffic offenses were more likely than the public at large to be unlicensed, the Court concluded random license-check stops were not sufficiently

productive. *Id.* at 660. The fourth amendment intrusions, despite being "limited in magnitude," were unjustified because they occurred "at the unbridled discretion of law enforcement officials." *Id.* at 661. "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.*

¶ 42     Applying the Supreme Court's balancing to the case at bar, the objective intrusions of the stop and visual inspection had already occurred by the time Officer Bland asked for defendant's license. All that remained of the objective intrusions identified in *Prouse* would be "questioning." It is difficult to fully analyze the subjective intrusion of asking for defendant's license after he was lawfully stopped. The trial court testimony gives no indication whether defendant knew Chattic had a warrant out for her arrest, or if he might have understood the traffic stop to be about her warrant and not his driving. But in any event, he had no reasonable expectation that his status as an unlicensed driver would remain private once he was lawfully stopped. To the extent defendant experienced heightened subjective intrusion by virtue of knowing he drove without a license, it was defendant's creation and not Officer Bland's. Toward the *Prouse* Court's analysis of whether this might be a "sufficiently productive mechanism" to justify its impact on the fourth amendment, it is not necessary to speculate whether drivers who borrow vehicles from registrants wanted by the law pose more risk of driving unlicensed. The fourth amendment intrusion of asking for a license from a driver who is already lawfully stopped is both objectively and subjectively minimal. This is especially true where, as here, there was a complete absence of officer discretion in asking for the license. Officer Bland testified on direct and cross examination that asking for a license from drivers pulled over was "standard operating procedure" and "a matter of routine." I agree with the majority that departmental policy will not remedy a constitutional infirmity; however, it does eliminate the central concern of *Prouse* and further minimize any fourth amendment intrusion presented by asking for defendant's license. *Prouse* thus counsels that any intrusion presented by demanding a license of a driver already lawfully pulled over while driving on a public roadway is minimal.

¶ 43     Applying *Caballes*, *Harris*, and *Prouse* to the case at bar, I would agree with the majority that defendant's compliance with Officer Bland's request for a license was compelled. Accordingly, the stop's duration was reasonable only if it was not prolonged beyond the time justified by looking for Pearlene Chattic and the "ordinary inquiries incident to such a stop." I do not agree with the majority's reasoning that Officer Bland's request for a license was a *per se* prolonging of the stop and would instead consider requesting a driver's license of a driver lawfully stopped on a public roadway to be an "ordinary inquir[y] incident to such a stop," under *Caballes*. As discussed above, the objective and subjective fourth amendment intrusion in examining the license of a driver who is already lawfully stopped is minimal. Where that driver is operating a vehicle on a public roadway at the time the lawful stop is initiated, it is entirely reasonable that an officer ensure he is legally permitted to drive that vehicle away when the stop concludes.

¶ 44     I would hold that where an officer lawfully initiates a traffic stop, carries out that stop reasonably, and acts pursuant to department policy, the officer may request a driver's license from the driver of that vehicle, as an ordinary inquiry incident to such a stop. This would hold true whether the officer pulled the vehicle over due to a warrant for the arrest of the vehicle's

registrant, for reasonable suspicion of an offense which proves to be accurate, or for reasonable suspicion of an offense which evaporates as he looks into it.

¶ 45 The majority's rule, while narrow in this case, casts a wider shadow—that officers need an independent basis for requesting a driver's license in a lawful traffic stop. This result protects a driver from an objectively and subjectively minimal intrusion, at the expense of complicating law enforcement in a situation "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). The Supreme Court has recognized that danger to driver and officer alike is minimized "if the officers routinely exercise unquestioned command of the situation." (Internal quotation marks omitted.) *Maryland v. Wilson*, 519 U.S. 408, 414 (1997). In addition to increasing risk by injecting needless uncertainty to law enforcement, the majority's decision also creates tension[3] with the legislature's expressed intent toward transparency in traffic stops. See 625 ILCS 5/11-212 (West 2012) (requiring law enforcement officers to gather statistical information on drivers stopped or cited; requiring Department of Transportation to analyze data and assess practices that resemble racial profiling). To reach this result, the majority has relied on cases that are outdated or inapposite, without examining whether the actions taken in this stop meaningfully intruded upon defendant's fourth amendment rights.

¶ 46 I find they did not, and I respectfully dissent.

¶ 47 JUSTICE THOMAS joins in this dissent.

---

[3]If not direct conflict—suppose a slightly different factual scenario of an officer who stopped a vehicle for what appeared to be expired registration and discovered on his approach that the registration was valid. Under the majority's rule, it would seem the officer would not be permitted to prolong the stop by continuing to the window to get the driver's demographic information. See 625 ILCS 5/11-212 (West 2012).