# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP756-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent-Petitioner, |
| |   v. |
| | Frederick S. Smith, |
| |         Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 372 Wis. 2d 184, 888 N.W.2d 22
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | January 9, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 5, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | Stephen E. Ehlke |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | A.W. BRADLEY, J. dissents joined by ABRAHAMSON J. (opinion filed). |
| | KELLY, J. dissents joined by ABRAHAMSON, J. and A.W. BRADLEY, J. (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner there were briefs by *Tiffany M. Winter,* assistant attorney general, with whom on the briefs were *Brad D. Schimel,* attorney general, and *Lisa E.F. Kumfer*, assistant attorney general. There was an oral argument by *Tiffany M. Winter.*

For the defendant-appellant there was a brief and oral argument by *Christopher D. Sobic,* assistant state public defender.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2015AP756-CR
(L.C. No. 2014CF667)

STATE OF WISCONSIN        :        IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent-Petitioner,

    v.

Frederick S. Smith,

    Defendant-Appellant.

**FILED**

**JAN 9, 2018**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA GRASSL BRADLEY, J. We are asked to decide whether the police violated Frederick S. Smith's Fourth Amendment rights when a police officer asked for his driver's license during a traffic stop even though reasonable suspicion for the stop dissipated as the officer approached the car, or when the police officer opened the passenger door after being told the driver's door and window were broken. The Fourth Amendment protects "against unreasonable searches and seizures,"[1]

_____

[1] The Fourth Amendment to the United States Constitution provides:

(continued)

and our analysis focuses on what is <u>reasonable</u> in light of the particular circumstances. See <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968); <u>see also</u> <u>Elkins v. United States</u>, 364 U.S. 206, 222 (1960)("What the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.").

¶2 We hold that when an officer conducts a valid traffic stop, part of that stop includes checking identification, even if the reasonable suspicion that formed the basis for the stop in the first place has dissipated. See <u>Rodriguez v. United States</u>, 135 S. Ct. 1609, 1615 (2015) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" (citing <u>Illinois v. Caballes</u>, 543 U.S. 405, 408 (2005)); <u>State v. Williams</u>, 2002 WI App 306, ¶1, 258 Wis. 2d 395, 655 N.W.2d 462 ("We conclude the officer had the requisite reasonable suspicion

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, § 11 of the Wisconsin Constitution likewise provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

2

to stop Williams's vehicle to determine if he was the suspect in a domestic abuse incident. We also conclude that, because the initial detention was lawful, the officer could properly ask Williams his name and for identification even if she had already decided he was not the suspect."). Asking for a driver's license does not impermissibly extend a stop because it is part of the original mission of the traffic stop. However, the "ordinary inquiries," which are related in scope to the purpose of a traffic stop, must be executed within the time it should have reasonably taken to complete them. Rodriguez, 135 S. Ct. at 1614.

¶3 We further hold the police officer's act of opening the passenger door in order to effectively communicate with a driver otherwise inaccessible due to the malfunctioning driver's door and window did not constitute an unreasonable search because the officer's actions, viewed objectively, would warrant a person of reasonable caution to believe the action taken was appropriate. See Terry, 392 U.S. at 21-22. Because Smith's stop was reasonably executed, we hold that no Fourth Amendment violation occurred. The circuit court[2] correctly denied Smith's suppression motion. Accordingly, the decision of the court of appeals[3] is reversed and Smith's judgment of conviction stands.

---

[2] The Honorable Stephen E. Ehlke, Dane County Circuit Court, presiding.

[3] State v. Smith, No. 2015AP756-CR, unpublished slip op., ¶1, (Wis. Ct. App. Sept. 29, 2016) (per curiam).

3

I.  BACKGROUND

¶4  On April 6, 2014, Madison Police Sergeant Bernard Gonzalez's duties included monitoring a Madison neighborhood for gang retaliation following what police believed to be gang-related shots fired the previous night.  At about 10:45 p.m., Gonzalez, while parked in the watch area, observed a car with dark tinted windows drive by and stop in the middle of the street for 10 to 15 seconds.[4]  This drew Gonzalez's attention "because [the car] did not pull to the curb.  It stopped in the middle of the street."[5]  Then, a passenger got out of the car and walked to apartment buildings, after which the car drove away.  Gonzalez followed the car, checked the license plate, and learned the registered owner, Amber Smith, had a suspended driver's license.  Gonzalez activated the squad's lights to get the car to pull over.  The car did not pull over right away, but proceeded to turn off the main street and turn again into a parking lot before finally pulling into a parking space and stopping.  When Gonzalez was five-to-ten feet from the driver's door, he "was pretty sure" the driver was not Amber Smith because the driver appeared to be a man.  When the sergeant

---

[4] The record indicates that at the preliminary hearing, held ten days after the stop, the sergeant testified Smith's car stopped in the middle of the road "[f]or about three minutes." At the suppression hearing, four months later, the testimony described the time as 10 to 15 seconds.  This discrepancy does not affect our analysis.

[5] The facts are presented in chronological order; all quoted testimony comes from the suppression hearing.

4

asked[6] the driver, later identified as Frederick Smith, to open the door or roll down the window, Smith shrugged his shoulders and responded that both the door and window were broken.  As is his typical practice in a traffic stop with an inoperable driver's side door and window, Gonzalez walked to the passenger side of the car to speak "more effectively" with Smith.  Smith appeared to be cooperating and moving toward the passenger seat, either activating the lock or reaching for the passenger door handle.  Gonzalez did not ask Smith to open the passenger side door or window; rather, the sergeant put his hand on the door handle, and testified that "together we opened the door." "[Smith] reached over and worked the door handle."  Gonzalez, believing Smith was cooperating by moving toward the passenger seat and trying to open the passenger door, testified that they "simultaneously . . . opened the door."[7]

¶5  Smith admitted that he "was maneuvering to the passenger seat" after telling Gonzalez the driver's door and

---

[6] The record is unclear as to whether Gonzalez simply <u>motioned</u> for Smith to roll down the window and open the door or verbally <u>asked</u> Smith to do so.  This uncertainty does not impact our analysis.

[7] The circuit court initially noted:  "So whether Sergeant Gonzalez first started to open the door or whether they opened it simultaneously, either way I conclude that under the Fourth Amendment reasonableness standards that it was a reasonable thing to do."  When Smith's lawyer asked the circuit court to find "Gonzalez was the one that opened the door," the circuit court found that "the sergeant went to open the door and began to open the door."  In doing so, the circuit court did not impugn the credibility of Gonzalez's testimony.

window were broken. Smith explained that "every day I use the car, I pull on the handle to get out because the driver's side don't open." Smith also said he stopped in that parking lot because he lived in a building next to it.

¶6 With the door open, Gonzalez observed that Smith had red, bloodshot eyes, and smelled of alcohol. When Gonzalez asked Smith for his driver's license, Smith responded that his license had been revoked. After conducting field sobriety tests, Gonzalez arrested Smith and took him to the police station where Smith refused to voluntarily give a blood sample. Gonzalez obtained a warrant and transported Smith to the hospital for the evidentiary blood test. Afterwards, Gonzalez drove Smith to the Dane County Jail where he agreed to provide a breath sample pursuant to the jail admitting procedures. The breath test showed Smith's blood alcohol to be .38. The State charged Smith with operating a motor vehicle under the influence of an intoxicant, seventh offense.

¶7 Smith moved to suppress all evidence acquired from the traffic stop, arguing that when Gonzalez saw a man (rather than a woman) driving the car, reasonable suspicion dissolved, and the stop should have immediately ceased. He also argued Gonzalez violated the Fourth Amendment when he opened the passenger door without any lawful basis to do so. The trial court denied Smith's motion and he pled guilty to operating a

6

motor vehicle under the influence, seventh offense, contrary to Wis. Stat. §§ 346.63(1)(a) and 939.62(1)(b) (2015-16).[8]

¶8 Smith did not file a postconviction motion but appealed to the court of appeals, arguing that all evidence should be suppressed and his judgment should be vacated because: (1) once Gonzalez saw a man (instead of a woman) behind the wheel, reasonable suspicion for the initially lawful stop evaporated, and the sergeant's failure to immediately release Smith improperly extended the duration of the seizure; and (2) the sergeant conducted an unlawful search in violation of the Fourth Amendment by opening the passenger door without consent or probable cause. The court of appeals declined to decide the case on the merits; instead, it determined the State's response to Smith's arguments on appeal were too cursory to warrant a review on the merits. The court of appeals vacated Smith's conviction and remanded the case to the circuit court ordering it to grant Smith's suppression motion; it sua sponte ordered that Smith be allowed to withdraw his plea. State v. Smith, No. 2015AP756-CR, unpublished slip op., ¶1 (Wis. Ct. App. Sept. 29, 2016) (per curiam). We granted the State's petition for review.

## II. STANDARD OF REVIEW & APPLICABLE LAW

¶9 A suppression issue presents a question of constitutional fact. See State v. Floyd, 2017 WI 78, ¶11, 377 Wis. 2d 394, 898 N.W.2d 560. "We review the circuit court's

---

[8] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

7

findings of historical fact under the clearly erroneous standard. But the circuit court's application of the historical facts to constitutional principles is a question of law we review independently." Id. (internal citations omitted).

¶10 The reasonableness of a traffic stop involves a two-part inquiry: first, whether the initial seizure was justified and, second, whether subsequent police conduct "was reasonably related in scope to the circumstances that justified" the initial interference. See Terry, 392 U.S. at 19-20; see United States v. Sharpe, 470 U.S. 675, 682 (1985). The mission of a traffic stop includes "determining whether to issue a traffic ticket" and the ordinary inquiries incident to the stop. Rodriguez, 135 S. Ct. at 1615. As long as the initial stop was lawful, requesting identification is a permissible part of the dual mission of every traffic stop. Id. The ordinary inquiries portion of the traffic stop's mission includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[9] Id.

---

[9] The United States Supreme Court in Rodriguez v. United States, 135 S. Ct. 1609 (2015), distinguished between inquiries that are related to a traffic stop and those that are unrelated. It concluded that asking for identification is an ordinary inquiry that is related to the purpose of a lawful stop as part of its dual mission and the stop "may last no longer than is necessary to effectuate that purpose." Id. at 1614-15. Unrelated inquiries, such as a dog sniff, occurring after the dual mission has been completed, violate the Fourth Amendment unless supported by additional reasonable suspicion or probable cause. Id. at 1612-14.

8

### III. DISCUSSION

#### A. Initial Stop and Ordinary Inquiries

¶11 Smith insists the circuit court should have suppressed the evidence that led to his seventh drunk-driving conviction because the officer unlawfully extended the duration of the seizure by continuing to question Smith after reasonable suspicion dematerialized. The State contends that because a traffic stop's mission includes the ordinary inquiries, such as checking a driver's license, an officer who lawfully stops a vehicle should be able to complete that mission even if the reason for the traffic stop ended during the officer's walk to the stopped vehicle.[10] The State is correct.

¶12 The United States Supreme Court recently reaffirmed that a police officer's "ordinary inquiries," reasonably executed during a lawful traffic stop—including "checking the driver's license"—do not violate the Fourth Amendment because these "routine measures" are "fairly characterized as part of the officer's traffic mission." See Rodriguez, 135 S. Ct. at 1615. "Because the Fourth Amendment and Article I, § 11 provide

---

[10] We note, however, that other facts of record in this case support ongoing reasonable suspicion that did not dissipate during this traffic stop and therefore provide further basis for upholding Smith's conviction. For example, Gonzalez could have issued a ticket to Smith under Wis. Stat. § 346.51 for stopping his car "upon the roadway." Nonetheless, because this case comes to us for a decision on whether an officer may continue with the ordinary inquiries when reasonable suspicion dissipates, our analysis focuses on that question. For the purposes of our analysis, we assume without deciding that reasonable suspicion had dissipated.

9

substantively identical protections, we have historically interpreted this section of the Wisconsin Constitution in accordance with United States Supreme Court interpretations of the Fourth Amendment."  State v. Asboth, 2017 WI 76, ¶11, 376 Wis. 2d 644, 898 N.W.2d 541.   Thus, we apply Rodriguez's interpretation of the Fourth Amendment.

¶13 There is no dispute that the initial seizure of Smith (the traffic stop) was justified.[11]  Gonzalez had a legal basis to stop the car Smith was driving.  Specifically, Gonzalez observed the driver of the car engage in suspicious activity in an area being watched for gang retaliation; these concerns prompted Gonzalez to run the license plate, which in turn came back registered to an owner who could not be legally driving. These facts provide reasonable suspicion sufficient to conduct a traffic stop.  See State v. Newer, 2007 WI App 236, ¶¶5, 7, 306 Wis. 2d 193, 742 N.W.2d 923 (reasonable suspicion exists to stop a vehicle if an officer has knowledge the owner of the vehicle has an invalid license); see also Floyd, 377 Wis. 2d 394, ¶20 ("Reasonable suspicion that a driver is violating a traffic law is sufficient to initiate a traffic stop.").  Thus, part one of the two-part test we apply to determine whether a traffic stop was reasonable is satisfied.  See Terry, 391 U.S. at 19-20.

---

[11] As this court acknowledged recently, "It is an unremarkable truism that a traffic stop is a seizure within the meaning of our Constitutions."  State v. Floyd, 2017 WI 78, ¶20, 377 Wis. 2d 394, 898 N.W.2d 560.

¶14 We turn our attention to part two of the reasonableness test——whether subsequent police conduct "was reasonably related in scope to the circumstances that justified" the initial interference. After Sergeant Gonzalez stopped Smith, he approached the driver's door. Moments before reaching the door, Gonzalez was "pretty sure" the driver was a man and not Amber Smith, the woman identified as the registered owner, who could not legally drive her car because her license had been suspended. The State conceded that the reasonable suspicion underpinning the traffic stop dissipated at that moment.

¶15 But in these particular circumstances, does the Fourth Amendment require a police officer to freeze, do an about-face, and walk away? Such a reaction is neither practical nor required.[12] According to the Supreme Court, the Fourth Amendment does not compel such an about-face because the mission of any lawful traffic stop includes routine measures like checking a driver's license. See Rodriguez, 135 S. Ct. at 1615 (the

---

[12] Justice Kelly asserts an officer can speak with the driver under these circumstances, but only to "inform him he was free to leave." Justice Daniel Kelly's dissent, ¶33. But, under Justice Kelly's analysis, any further contact with the driver is not permitted under the Fourth Amendment because the officer cannot continue the seizure past the moment reasonable suspicion dissipates. Justice Kelly can't have it both ways. The idiocracy of having to waive a driver off who has been legally seized without any explanation is another reason why the ordinary inquiries do not violate the Fourth Amendment. The officer must be able to complete the traffic stop by speaking with the driver, documenting a name for the officer's reporting requirements, and providing the stopped driver with the courtesy of an explanation for the seizure.

11

mission of a lawful traffic stop includes both "determining whether to issue a traffic ticket" and conducting the ordinary inquiries).

¶16 Before applying Rodriguez to the particular circumstances in Smith's case, we first examine the conditions surrounding the Supreme Court's holding in Rodriguez. In its 2014-15 term, the Supreme Court had before it petitions for certiorari in two related cases:  (1) Rodriguez v. United States, 135 S. Ct. 1609 (2015), where the Eighth Circuit Court of Appeals upheld Dennys Rodriguez's drug conviction arising from drugs discovered by a narcotics dog after all the business related to a traffic stop had been completed; and (2) People v. Cummings, 2014 IL 115769, ¶¶1-2, 6 N.E.3d 725 (hereinafter Cummings I), where the Illinois Supreme Court granted the defendant's motion to suppress evidence police discovered during a traffic stop.  In Cummings I, an outstanding warrant for the registered owner of the vehicle, who was a woman, generated reasonable suspicion for the traffic stop.  Cummings I, 6 N.E.3d 725, ¶5.  As the officer approached the stopped vehicle, however, the officer saw the driver was a man, not a woman. Id., ¶7.  All three levels of Illinois courts held that suppression was appropriate because reasonable suspicion for the lawful stop disappeared when the officer saw a man (not a woman) behind the wheel.  Id., ¶¶8-9.  The Illinois Supreme Court held that by asking the driver for identification, the officer "impermissibly extended the stop."  Id., ¶26.

12

¶17 Rodriguez and Cummings are both Fourth Amendment cases involving traffic stops where defendants sought suppression of evidence based on arguments that police unlawfully extended the stop. Six days after the Supreme Court decided Rodriguez, it vacated the judgment in Cummings I, and "remanded to the Supreme Court of Illinois for further consideration in light of" Rodriguez. See Illinois v. Cummings, 135 S. Ct. 1892 (Mem) (Apr. 27, 2015).

¶18 On remand, the Illinois Supreme Court set forth the Supreme Court's conclusions in Rodriguez:

- A dog sniff that prolongs a stop in an attempt to detect evidence of wrongdoing is "not part of the officer's 'mission' for the stop."

- "The Court defined the mission of the stop as 'to address the traffic violation that warranted the stop' and to 'attend to related safety concerns.'"

- The mission's safety concerns permit officers to make "ordinary inquiries incident to [the traffic stop]."

- "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."

- Actions outside the mission of the stop that "measurably extend the duration of the stop" "cause the stop to become unlawful" unless reasonable suspicion supports the extension.

13

- The Court drew a bright line against extending a stop "with inquiries outside the mission of a traffic stop" absent reasonable suspicion for the outside inquiries.

- The Court precisely defined what inquiries are part of the traffic stop and what inquiries fall outside the mission of a traffic stop.

See Cummings, 2016 IL 115769, ¶7, 46 N.E.3d 248 (hereinafter Cummings II) (citations omitted). Based on the directives of Rodriguez, the Illinois Supreme Court reversed its earlier determination that the stop in Cummings I violated the Fourth Amendment. Id., ¶13. Instead, it ruled a police officer may lawfully check a driver's license even though reasonable suspicion for the stop ended when the officer saw a man (not a woman) behind the wheel. Id. The Illinois Supreme Court held this did not render the seizure unreasonable because Rodriguez recognized the purpose of a traffic stop includes the "ordinary inquiries" of checking a driver's license. Id. In other words, when a traffic stop is lawful at its inception, a police officer may complete the ordinary inquiries even if reasonable suspicion "vanished upon seeing the defendant" because the purpose of the stop is not concluded until the ordinary inquiries are completed. Id., ¶18. "Such ordinary inquiries are part of the stop's mission and do not prolong the stop, for fourth amendment purposes." Id.

¶19 When the Supreme Court vacated the judgment in Cummings I and remanded the case to the Illinois Supreme Court for further consideration in light of Rodriguez it signaled that

14

"ordinary inquiries" remain reasonable for the duration of an otherwise lawful stop. The Illinois Supreme Court's interpretation of Rodriguez in Cummings II is correct. Rodriguez concludes that an officer's mission in conducting a traffic stop includes "whether to issue a traffic ticket" and the "ordinary inquiries incident to [the traffic stop]." Rodriguez, 135 S. Ct. at 1615. These include: "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. The justification for the ordinary inquiries is two-fold: (1) these checks serve to enforce the traffic code by "ensuring that vehicles on the road are operated safely and responsibly"; and (2) for officer safety.[13] Id. at 1615-16. The Supreme Court protected Fourth Amendment rights by emphasizing that a traffic stop's mission

---

[13] This court just last term acknowledged the "legitimate and weighty" concern for officer safety attendant to every traffic stop:

> Traffic stops are "especially fraught with danger to police officers...." Rodriguez, 135 S. Ct. at 1616 (quoting [Arizona v.] Johnson, 555 U.S. [323, 330 (2009)]); see also [Pennsylvania v.] Mimms, 434 U.S. [106, 110 (1977)] ("We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty."). That makes officer safety an integral part of every traffic stop's mission. Rodriguez, 135 S. Ct. at 1616 ("Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself.").

Floyd, 377 Wis. 2d 394, ¶26.

should not extend beyond the amount of time reasonably required to complete it, and an officer must proceed diligently, id. at 1616, thereby eliminating the potential for police to delay the ordinary inquiries to delve into unrelated and undiscovered criminal wrongdoing.

¶20 We return to the particular facts in Smith's case in light of Rodriguez's conclusion that the lawfully initiated traffic stop includes both considering whether to issue a ticket and conducting the ordinary inquiries. When Gonzalez saw the driver of the stopped car was a man, the first part of the mission ended. Gonzalez would not be issuing a ticket to Amber Smith for driving with a suspended license. The second mission of the traffic stop, however, had not been performed——checking the driver's license, registration, and insurance. To accomplish this, Gonzalez followed his normal practice where a driver's door does not work and walked around to the passenger side of the car. Smith concedes he was moving over to the passenger side and reaching for a handle on the passenger door. He even explained this is a movement he makes every time he has to get in and out of the car. In fact, unless Smith planned to sleep in the car, it is logical that Smith would get out of the car because he had pulled into a parking spot in the lot where his residence is located. Gonzalez thought Smith was struggling to open the passenger door so he put his hand on the outside door handle and pulled the door open. Upon opening the door, Gonzalez learned Smith did not have a valid driver's license

16

either. It is at this point Gonzalez suspected Smith had been driving drunk.

¶21 Thus, applying the directives from Rodriguez, we hold the stop in Smith's case did not violate the Fourth Amendment. The mission of the lawful traffic stop did not end when reasonable suspicion dissipated because at that moment, the sergeant had not completed the ordinary inquiries of checking Smith's license, registration, and insurance. Before Gonzalez could complete the ordinary inquiries incident to the stop, he discovered Smith did not have a valid driver's license and saw signs Smith had been driving drunk. At this point, the sergeant had probable cause to extend the stop to investigate and eventually arrest Smith for drunk driving.

¶22 In addition, the record shows Gonzalez acted promptly in his attempt to accomplish the mission of this traffic stop; there is nothing to suggest Gonzalez slothed through the mission to fish for wrongdoing. We emphasize, as did the Rodriguez Court, that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are——or reasonably should have been——completed." Rodriguez, 135 S. Ct. at 1614. Police actions in all traffic stops will be scrutinized to ensure a temporary detention "last[s] no longer than is necessary to effectuate the purpose of the stop." Sharpe, 470 U.S. at 684; Rodriguez, 135 S. Ct. at 1614. Neither the Fourth Amendment nor the cases interpreting it require this traffic stop seizure to end at the moment Gonzalez saw a man instead of a woman in the driver's seat. The Fourth Amendment presented no bar to

17

Gonzalez taking the minimally intrusive, routine measure of checking the identification of the driver. Because Gonzalez did so in a reasonable manner and within a reasonable amount of time, Smith's stop was not unlawfully prolonged. See Rodriguez, 135 S. Ct. at 1615; see also, State v. House, 2013 WI App 111, ¶¶6, 9, 350 Wis. 2d 478, 837 N.W.2d 645 (concluding the purpose of traffic stop ended when "everything related to the initial stop" had been completed including running a check on defendant's license and returning license to the defendant); State v. Gammons, 2001 WI App 36, 241 Wis. 2d 296, 625 N.W.2d 623 (holding the purpose of the traffic stop had concluded after the reason for the initial seizure had been satisfied, the driver and the two passengers had provided identification, and the officer had run computer checks on all three).

¶23 Our conclusion that this traffic stop comports with the Fourth Amendment is further supported by existing Wisconsin case law. Before the United States Supreme Court decided Rodriguez, our court of appeals already decided that when "the initial detention was lawful" an officer can properly ask for a driver's name and identification card even when the officer "had already decided" the driver "was not the suspect." See State v. Williams, 2002 WI App 306, ¶1, 258 Wis. 2d 395, 655 N.W.2d 462. In Williams, a police officer stopped a vehicle thinking the driver was a wanted domestic abuse suspect named Demetrius Phillips. Id., ¶¶2-3. The driver told the officer his name was Vernell Williams, but he did not have any identification to

18

prove his identity. Id. The officer called another officer who knew a lot of people in the neighborhood to see if Williams' identity could be verified. Id., ¶4. The second officer confirmed that Williams was who he said he was. Id. At this point, the police knew the driver was not the domestic abuse suspect, but they had the dispatcher run his name and birthdate anyway and found Williams did not have a valid driver's license. Id. Further investigation led to the discovery of cocaine in the car and Williams filed a motion to suppress the evidence. Id., ¶¶4-5, 8. The court of appeals concluded the officer's actions were lawful because the request for the driver's name and identification was reasonable, even if the request came after the officer realized the driver was not the suspect the officer sought.[14] Id., ¶18. The court of appeals further held that when "Williams stated that he had no identification, there was a reasonable ground for further detention," id., ¶22, based on Wis. Stat. § 343.18(1)'s requirement that persons operating

---

[14] The court of appeals also relied on a community caretaker vehicle case, State v. Ellenbecker, 159 Wis. 2d 91, 464 N.W.2d 427 (Ct. App. 1990), in reaching its conclusion. See State v. Williams, 2002 WI App 306, ¶¶18-21, 258 Wis. 2d 395, 655 N.W.2d 462. We question whether Ellenbecker was properly decided but decline to address that specific issue as it is not dispositive here.

19

motor vehicles must have their driver's licenses with them.[15] These routine measures are reasonable because they ensure the driver has a valid license and they document the driver's identity in case there is a complaint after the stop.

¶24 Smith distinguishes his case from Rodriguez because reasonable suspicion for the traffic stop in that case continued for the duration of the stop, whereas here, the State conceded that reasonable suspicion dissipated as Sergeant Gonzalez approached Smith's car. We need not guess whether the Supreme Court would rule differently if faced with a case where reasonable suspicion dissipated after a lawful stop but before the ordinary inquiries could take place. The Supreme Court in fact had that very case before it——Cummings I——concomitantly with Rodriguez and although the Court never issued an opinion, its procedural actions signal that the Fourth Amendment does not compel an officer to prematurely terminate a lawful stop by dispensing with the ordinary inquiries.

¶25 First, Rodriguez does not specifically limit its holding to a lawful stop where reasonable suspicion does not dissipate. Given that the Supreme Court had before it both Rodriquez——a case where reasonable suspicion remained until the

---

[15] Wisconsin Stat. § 343.18(1)'s requirement that all drivers possess a driver's license while driving and display it "upon demand from any judge, justice, or traffic officer" further supports our opinion. It is reasonable to expect to show a driver's license when a police officer conducts a traffic stop.

ordinary inquiries had been completed, and Cummings——a case where reasonable suspicion vanished before the ordinary inquiries could be made, the Supreme Court most certainly would have pointed out this distinction if the Court determined it commands opposite Fourth Amendment outcomes.

¶26 Second, six days after deciding Rodriguez, the Supreme Court vacated the judgment in Cummings I and told the Illinois Supreme Court to reconsider its ruling. See Illinois v. Cummings, 135 S. Ct. 1892 (Mem) (2015). Again, the Illinois Supreme Court initially ruled in favor of the defendant in Cummings I, holding that the police officer could not ask to see his driver's license after reasonable suspicion vanished. See Cummings I, 6 N.E.3d 725, ¶20. It is not logical or reasonable for the Supreme Court to have vacated Cummings I if it believed the Illinois Supreme Court reached the correct result. There would be no reason to make the Illinois Supreme Court redo its decision if the Supreme Court believed the law prohibits a license check when reasonable suspicion dissipates before the officer speaks with the driver. That is what the Illinois Supreme Court had already ruled. If the Supreme Court wanted to limit the ordinary inquiries only to cases where reasonable suspicion remained until those routine procedures were completed, presumably the Court would have simply let the Illinois Supreme Court ruling in Cummings I stand. If the disappearance of reasonable suspicion extinguished an officer's ability to proceed with ordinary inquiries, logically the

21

Supreme Court would have said so either in Rodriguez itself or by writing an opinion in Cummings I.

¶27 Third, the Illinois Supreme Court's analysis in Cummings II upon remand from the Supreme Court is sound. That court certainly could have distinguished Cummings from Rodriguez based on the vanishing reasonable suspicion factor, but did not. A unanimous court interpreted Rodriguez and the Supreme Court's granting, vacating, and remanding in Cummings I to mean a police officer who lawfully stops a vehicle may engage in the ordinary inquiries even if the reasonable suspicion initiating the stop dissipates.

¶28 Fourth, our court of appeals recently interpreted Rodriguez in the same way the Illinois Supreme Court did. In State v. Cotter, No. 2015AP1916-CR, unpublished slip op. (Wis. Ct. App. Aug. 25, 2016)(per curiam) a police officer stopped a car based on information that the registered owner (a woman) had a non-valid license.[16] Id., ¶¶7, 9. The driver of the car, however, turned out to be a man, not a woman. Id., ¶9. One of the car's passengers, Charles Cotter, challenged his narcotic drug conviction resulting from the discovery of heroin on his person during a pat-down search. Id., ¶¶10-14. Cotter argued

---

[16] We note that State v. Cotter, No. 2015AP1916-CR, unpublished slip op. (Wis. Ct. App. Aug. 25, 2016)(per curiam) is an unpublished per curiam, which according to Wis. Stat. § 809.23(3) may not be cited by the parties. This court, of course, is not a party. Moreover, Cotter is cited for the fact that the decision exists rather than for reliance on its legal analysis and holding.

22

this evidence should have been suppressed because once the officer saw the driver was a man, and not the woman with the invalid license, the officer no longer had any valid reason to extend the stop. Id., ¶14. That case also involved a broken driver's-side window, resulting in the officer having to open the passenger door to speak with the occupants. Id., ¶10. Our court of appeals held that Rodriguez controlled and this stop did not violate the Fourth Amendment because (1) the police lawfully stopped the car based on the registered owner's invalid license; and (2) even though the officer "could not issue a ticket on the basis for which the stop was initiated" the officer could "continue the stop for purposes of completing routine matters such as gathering [the driver's] license information, making attendant observations in the process." Id., ¶18. The court of appeals concluded that the reasonable suspicion that developed while the ordinary inquiries occurred "provided a basis for the officers to extend the stop" and as a result, the discovery of heroin during Cotter's pat-down did not violate the Fourth Amendment. Id., ¶19. Cotter correctly points out that conducting the ordinary inquiries is not an extension of the stop; it is part of the mission of the stop itself. Discovering additional reasonable suspicion during the ordinary inquiries can lead to a legal basis upon which to extend the stop beyond the ordinary inquiries.

¶29 The three cases on which Smith heavily relies in advancing his contrary position, Delaware v. Prouse, 440 U.S. 648 (1979), Florida v. Royer, 460 U.S. 491 (1983), and State v.

23

Coleman, 890 N.W.2d 284 (Iowa 2017), are either distinguishable or not controlling.

¶30 First, Smith argues Delaware v. Prouse shows Gonzalez's conduct violated his Fourth Amendment rights. Prouse held that random traffic stops simply to check a driver's license and registration absent any basis to stop the vehicle violated the Fourth Amendment. 440 U.S. at 650. But this is not what happened to Smith. Here, it is undisputed there was a lawful basis to stop the car Smith drove.

¶31 Second, Smith turns to Florida v. Royer for its holding that police may not detain a person for "longer than is necessary to effectuate the purpose of the stop," and the "methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 460 U.S. at 500. Royer involved an airport traveler suspected of transporting narcotics in his suitcase. Id. at 493-94. After approaching the traveler and questioning him, undercover officers took him into a large closet with a desk and two chairs, where he was in essence under arrest. Id. at 494-97. Smith's situation, unlike Royer, involved a traffic stop based on reasonable suspicion. As already explained, Rodriguez tells us the purpose and scope of any lawful traffic stop includes both the officer's decision on whether to issue a ticket (which Gonzalez could not do because reasonable suspicion on that aspect dissipated), as well as the officer's completion of ordinary inquiries (which Gonzalez was attempting to do when he saw signs that Smith was driving drunk). We are also not

24

persuaded by Smith's assertion that Gonzalez violated Royer's requirement that an officer should use the "least intrusive means" in an investigative detention.  Smith argues the least intrusive means here required Gonzalez to speak to Smith through the closed and inoperable window.  Even if we could agree that requiring Gonzalez to shout through a closed window late at night constitutes the least intrusive means, it is unreasonable to expect Gonzalez to accomplish the ordinary inquiries through a closed window.  Under Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977), an officer may ask a driver to step out of the car during a traffic stop because "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements" which could threaten the officer's safety.  A face-to-face confrontation is also necessary to accomplish the ordinary inquiries, as it would be difficult if not impossible to check a driver's license, registration, and insurance without having those documents in hand.  Requiring Gonzalez to accomplish the ordinary inquiries in the dark through a closed window is illogical and unreasonable.

¶32  The third case Smith proffers to support his position is State v. Coleman, 890 N.W.2d 284 (Iowa 2017).  Coleman is a post-Rodriguez case in which a sharply divided Iowa Supreme Court held, based on the Iowa Constitution, that an officer cannot conduct the ordinary inquiries if reasonable suspicion dispels after the initially lawful stop.  Id. at 285.  The majority in Coleman rejected Rodriguez's recitation of the long-

established rule that ordinary inquiries are part of a lawful traffic stop as "dicta." Id. at 300. Three Iowa Supreme Court Justices dissented in Coleman, criticizing the majority for disregarding Rodriguez, for ignoring Iowa's statute that requires drivers to carry a driver's license and "display it upon an officer's request," for overruling prior Iowa case law consistent with Rodriguez, and for concluding for the first time that the search and seizure provision in Iowa's Constitution provides greater protection than the Fourth Amendment to the United States Constitution. Id. at 301-05. We are not persuaded by Coleman for several reasons. First, we are not bound by Iowa law, particularly judicial interpretations of its own constitution. Second, it applies an untenably cramped interpretation of the holding in Rodriguez. Third, it ignores the clear message the Supreme Court conveyed in its handling of Cummings I, resulting in the Illinois Supreme Court's reversal. Notably, Coleman is the only post-Rodriguez case in the country to conclude that checking a driver's license during an initially lawful traffic stop constitutes an unreasonable seizure when reasonable suspicion for the stop evaporates as the officer approaches the stopped car.[17] We agree with the dissenters in

---

[17] Smith also cites numerous other state and federal cases he contends prohibit police from asking for identification if reasonable suspicion triggering the traffic stop dissipated as the officer approached the vehicle. All of these cases, however, pre-date the Supreme Court's decision in Rodriguez v. United States, 135 S. Ct. 1609 (2015).

26

<u>Coleman</u> in regarding an officer's request to see a driver's license during a traffic stop as "completely unobjectionable and, indeed, mundane" and therefore unquestionably constitutional.  <u>Id</u>. at 302.[18]

---

[18] Justice Daniel Kelly's dissent conjures a law enforcement boogeyman but if speculation and storytelling determine the reasonableness of a police officer's actions, consider this reworked storyline:

> Female driver (name unknown as the officer will not be permitted to ask):  What are you stopping me for officer?
>
> Officer Doe:  I'm sorry.  I stopped this minivan because it is registered to Mr. Jones whose license is suspended.  But, you are not Mr. Jones.  I apologize for any inconvenience.  You are free to go.
>
> Female driver drives away.
>
> Officer Doe returns to his squad car and 30 minutes later hears a radioed alert to be on the lookout for a female suspect wanted for sex trafficking.  There are warrants out for her arrest.  The female is thought to be driving a minivan with six kidnapped girls.  The suspect matches the description of the driver Officer Doe just let go.  The female driver is never caught and five of the six girls are never heard from again.  When the police locate the minivan, they find the sixth missing girl who has been badly beaten and drugged.  She reports the girls were forcibly drugged and physically and sexually abused and further reveals the trafficker's plan to transport the girls overseas to be sold as sex slaves.  The sixth girl later dies at the hospital during surgery to stop her internal bleeding.

(continued)

27

Justice Kelly's strawman overlooks a significant restraint on law enforcement: constitutional reasonableness. The parade of horribles Justice Kelly proffers is as probable as the proverbial boogeyman's existence. They are designed to frighten despite materializing only in imagination and myth. The principles declared today are not new. Nearly 40 years ago, the United States Supreme Court recognized that checking a driver's license during an otherwise lawful traffic stop constitutes a permissible inquiry. See Rodriguez, 135 S. Ct. at 1615 (citing Delaware v. Prouse, 440 U.S. 648, 658-660 (1979)). No court has expanded the ordinary inquiries incident to a traffic stop to include headlight, horn, or exhaust performance because the Fourth Amendment commands reasonableness. We think the typical scenario in Officer Doe's stop of Mrs. Brown's minivan would be:

Officer Doe: License and registration please.

Mrs. Brown: Yes Officer. Here it is. Did I do something wrong?

Officer Doe: The car you are driving is registered to a Mr. Jones whose license is suspended.

Mrs. Brown: Oh no. I borrowed this minivan to get these kids to soccer practice. The Jones' are my neighbors.

Officer Doe: Got it. Give me a couple minutes to clear this up.

Officer Doe goes back to the squad car and runs Mrs. Brown's license. He comes back moments later, returns Mrs. Brown's license, and says: "I'm sorry for the inconvenience. Everything checks out. You may be on your way."

It is often easy for a court, which has the luxury to study the cold transcripts and ponder the nuances of case law, to criticize an officer's split-second decisions in high crime areas late at night. But reasonableness cannot be measured with 20/20 hindsight; instead, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments——in circumstances that are tense, uncertain, and rapidly evolving . . . " Graham v. Connor, 490 U.S. 386, 396-97 (1989). Sergeant Gonzalez's actions here were reasonable.

(continued)

28

B. Opening of the Passenger Door

¶33 Smith also argues that opening the passenger door constituted a separate Fourth Amendment event requiring additional reasonable suspicion. We do not agree. Whether a search or seizure is reasonable depends upon the particular facts of each case, and what Gonzalez did under these facts was reasonable. See South Dakota v. Opperman, 428 U.S. 364, 375 (1976) (citation omitted).[19] Gonzalez approached the driver's door and asked Smith to open the door or the window. Smith responded that both were broken. As Gonzalez walked around to the passenger door, Smith appeared to be cooperating and moving toward the passenger seat, and seemed to be trying to open the passenger door. The officer testified that Smith and he simultaneously opened the door and that they opened it

---

[19] Courts have recognized a variety of circumstances where a search of a car does not infringe upon the Fourth Amendment: (1) when the driver consents, see Florida v. Jimeno, 500 U.S. 248 (1991); (2) when an officer sees contraband in plain view, see State v. Buchanan, 2011 WI 49, ¶¶26-27, 334 Wis. 2d 379, 799 N.W.2d 775; (3) incident to an arrest, see Arizona v. Gant, 556 U.S. 332 (2009); (4) when an officer has probable cause to suspect a crime, see United States v. Ross, 456 U.S. 798 (1982); and (5) when a car has been impounded, see South Dakota v. Opperman, 428 U.S. 364 (1976). Police may also order the driver out of a vehicle for officer safety. See Pennsylvania v. Mimms, 434 U.S. 106 (1977); see also United States v. Stanfield, 109 F.3d 976, 981 (4th Cir. 1997) (recognizing certain circumstances in which opening at least one of the vehicle's doors is consistent with concerns of officer safety).

29

together.[20] An officer may make reasonable inferences based on the facts drawn from his experience. Terry, 392 U.S. at 21-22. It was reasonable for Gonzalez to infer that Smith's movements indicated he was willingly opening (or attempting to open) the passenger door. The sergeant needed to communicate with and identify the driver whom he had stopped and there was no avenue to do that on the driver's side of the car due to the inoperable driver's window and door.

¶34 Smith offers New Jersey v. Woodson, 566 A.2d 550 (N.J. Super. Ct. App. Div. 1989), in support of his argument that Gonzalez unreasonably opened the door. Smith's reliance on Woodson is misplaced. We are neither bound by New Jersey authority nor persuaded that it presents similar facts. In Woodson, police conducted a traffic stop and immediately opened the car door without making any attempt to speak with the driver. Id. at 551. The New Jersey court held this police conduct violated the Fourth Amendment. Id. at 552. Woodson's facts are clearly distinguishable from Smith's.

¶35 Finally, Gonzalez's act of opening the passenger door did not violate the Fourth Amendment because under all the facts and circumstances, the action was reasonable and this intrusion on Smith's personal liberty was an incremental, de minimus one. See Mimms, 434 U.S. at 109-11. Under Mimms, a police officer

---

[20] Again, we acknowledge the circuit court found it was the officer who opened the door. Nonetheless, the circuit court did not find the officer's testimony in this regard not credible.

has the right to a face-to-face encounter with a driver during a lawful traffic stop. "[T]his additional intrusion can only be described as de minimus." Id. at 111.[21]

### IV. CONCLUSION

¶36 We acknowledge that the police are not infallible, and a police officer may intentionally or unintentionally infringe upon the constitutional rights of Wisconsin citizens. If that happens, it is the duty of this court to impose consequences for such violations. Terry, 392 U.S. at 12 ("[E]xcluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct."). Likewise, when the police abide by the rules and act reasonably, the Fourth Amendment is not violated and we must uphold convictions.

¶37 The Supreme Court's most recent pronouncement on the scope of constitutionally reasonable traffic stop seizures, Rodriguez v. United States, 135 S. Ct. 1609 (2015), requires upholding Smith's conviction. Rodriguez acknowledges that "ordinary inquiries" are part of the mission of every lawful and reasonably executed traffic stop. The mission of such stops is not completed until the police officer checks a driver's identification, even if reasonable suspicion for stopping the

---

[21] Justice Ann Walsh Bradley's dissent assumes that Smith had permission to drive his sister's car. See Justice Ann Walsh Bradley's dissent, ¶11. There is nothing in the record establishing that Smith had permission to drive his sister's car.

31

vehicle dissipates as the officer approaches the vehicle. Further, the officer's act of opening the passenger door to facilitate safe, face-to-face contact with the otherwise inaccessible driver did not constitute an unreasonable search.

*By the Court.*—The decision of the court of appeals is reversed.

¶38 ANN WALSH BRADLEY, J. *(dissenting).* I join Justice Kelly's dissent. However, I write separately because I determine that the majority compounds its error when it departs from the clear directive of Pennsylvania v. Mimms, 434 U.S. 106 (1977) (per curiam), extending the holding past its breaking point and further eroding the protections of the Fourth Amendment.

¶39 Contrary to the majority, I apply the clear precedent and conclude that Smith's Fourth Amendment rights were violated when Sergeant Gonzalez opened Smith's passenger side door without a warrant or consent. Accordingly, I respectfully dissent.

I

¶40 In Mimms, law enforcement officers pulled the defendant over for driving a vehicle with an expired license plate. Id. at 107. One of the officers approached the car and asked the defendant to step out. Id. When the defendant did so, the officer noticed a bulge in his jacket, which turned out to be a gun. Id. After the State indicted the defendant on two weapons related offenses, the defendant moved to suppress the gun as evidence. Id.

¶41 The United States Supreme Court concluded that the police officers acted properly because law enforcement officers are allowed to order occupants to exit a lawfully stopped vehicle even if there is nothing unusual or suspicious about their behavior. Id. at 111. This court has recognized Mimms as

1

establishing a clear directive, "a per se rule that an officer may order a person out of his or her vehicle incident to an otherwise valid stop for a traffic violation." State v. Johnson, 2007 WI 32, ¶23, 299 Wis. 2d 675, 729 N.W.2d 182 (emphasis added); State v. Floyd, 2017 WI 78, ¶24, 377 Wis. 2d 394, 898 N.W.2d 560.

¶42 Therein lies the rub. As set forth in Justice Kelly's dissent, the facts here do not support the conclusion that this was "an otherwise valid stop." Indeed, the State conceded that reasonable suspicion had dissipated when the officer realized the male driver was not the female registered owner. Majority op., ¶14.

II

¶43 Not only does the majority violate Mimms' clear directive, it extends the holding beyond what is constitutionally permissible. Mimms explains that law enforcement officers may order occupants out of a vehicle during a traffic stop. It does not suggest that police may open a vehicle door and invade the space inside absent a warrant. See State v. Woodson, 566 A.2d 550, 552 (N.J. Super. Ct. App. Div. 1989) ("There is a significant difference between ordering one out of a car and opening a car door without warning. In the former case, the occupant has an opportunity, before opening the door and leaving the car, to safeguard from public view matters as to which he has a privacy interest").

¶44 The majority fails to acknowledge the limitations of Mimms and extends its holding past its breaking point, reading

2

language into that opinion that is not present. Mimms does not permit the officer's conduct in this case. Contrary to the majority's assertion, Mimms does not imply that a police officer has "the right to a face-to-face encounter." See Majority op., ¶35. And, it certainly does not extend such a right once the validity of the stop has been undermined because reasonable suspicion has dissipated.

¶45 Rather, Mimms is limited to an officer verbally ordering an occupant out of a vehicle. In determining that Mimms allows an officer to not only order an occupant out of a vehicle but to also invade the interior space of a vehicle by opening the door, the majority departs from what is constitutionally permissible and disregards the facts of this case.

¶46 The Fourth Amendment protects against unreasonable searches and seizures and focuses on the reasonable expectation of privacy. U.S. Const., amend. IV; Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); State v. Bruski, 2007 WI 25, ¶22, 299 Wis. 2d 177, 727 N.W.2d 503; see also Wis. Const. art I, § 11. Yet, the majority's conclusion ignores that a defendant in Smith's position has a reasonable expectation of privacy in the interior of a vehicle. See State v. Dixon, 177 Wis. 2d 461, 470, 501 N.W.2d 442 (1993) ("This relationship [between the vehicle owner and the driver] and prior use of the vehicle point to the defendant having an expectation of privacy in the interior of the truck that society is willing to recognize as reasonable").

3

¶47 The record reflects that the vehicle Smith was driving belonged to his sister. A person who borrows a car and drives it with the owner's permission has an expectation of privacy in the interior of the vehicle which society is willing to recognize as reasonable, especially where the owner of the car is a family member.[1] See id. at 470-72 (citing United States v. Griffin, 729 F.2d 475, 483 n.11 (7th Cir. 1984), cert. denied, 469 U.S. 830 (1984) (accused who borrowed a car from his brother had a protectable privacy interest in the vehicle)). Opening the door of a vehicle is clearly contrary to this reasonable expectation of privacy.[2]

¶48 With no reasonable suspicion remaining to support the stop, the objective of the stop at the point Gonzalez opened the door was simply to communicate with Smith. But this easily could have been accomplished without invading the interior of the car. The record reflects that Sergeant Gonzalez successfully communicated with Smith through the closed door and

---

[1] The record indicates that the prosecutor never contended that Smith used the vehicle without permission. During cross examination, Smith reiterated that the car was his sister's. The prosecutor did not elicit any testimony about consent and there is nothing in the record indicating that Smith's use of the vehicle was without his sister's permission.

[2] I further observe that Officer Gonzalez violated the United States Supreme Court's decree that law enforcement must employ "investigative methods" that are the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983). The record does not support the assertion that opening Smith's passenger side door was the least intrusive means of completing the objective of the stop.

4

window on the driver's side of the car and understood Smith's responses without having to repeat himself. Why then was it necessary to open the door?

¶49 Applying the clear precedent under the facts presented, I conclude that Smith's Fourth Amendment rights were violated when Sergeant Gonzalez opened Smith's passenger side door without a warrant or consent.

¶50 Finally, I observe that once again a majority of this court continues the trend of diminishing Fourth Amendment protections we have seen in recent years. See Floyd, 377 Wis. 2d 394, ¶¶83-89 (Ann Walsh Bradley, J., dissenting). To give meaning to the Fourth Amendment, we must use it as a check on governmental power. This court's decision fails to provide this check, instead giving law enforcement carte blanche to detain individuals when there is no reasonable suspicion that they have done anything wrong. The majority further gives officers free reign to invade a space in which a person has a reasonable expectation of privacy without a warrant or consent when less intrusive means of communication demonstrably suffice.

¶51 Accordingly, I respectfully dissent.

¶52 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

¶53 DANIEL KELLY, J. *(dissenting).*

I

¶54 Frederick Smith is not a sympathetic character. This case is here only because he was driving an automobile while drunk——really drunk: his blood alcohol level was .38 when he was arrested.[1] This is not his first time, or even his second. In fact, this is the seventh time he has been arrested and convicted of driving while intoxicated. And because we can be pretty confident that drunk drivers are not caught every time they go abroad with too much alcohol in their system, it's reasonable to believe that seven-time offenders make a habit of putting at risk the lives of everyone around them. It is not without reason that drunk drivers have been described as a scourge. See, e.g., State v. Nordness, 381 N.W.2d 300, 307, 128 Wis. 2d 15 (1986) (describing drunk driving as "transform[ing] an innocent user of a highway into a victim at any time . . . " and as "a scourge on society"). To live in society peacefully, we must have at least a minimal level of trust that our neighbors won't habitually place us in mortal danger. We can count ourselves fortunate that Officer Gonzalez apprehended Mr.

---

[1] To put this in context, a person with a blood alcohol concentration of .31 (that is, less than Mr. Smith), is at risk of death by alcohol poisoning. See, e.g., National Institute on Alcohol Abuse and Alcoholism, Alcohol Overdose: The Dangers of Drinking Too Much, https://pubs.niaaa.nih.gov/publications/alcoholoverdosefactsheet /overdosefact.htm (last visited Dec. 1, 2017).

1

Smith before he could maim or kill someone with the car he was driving. The people of Wisconsin want drunk drivers to be stopped. They <u>need</u> drunk drivers to be stopped.

¶55 None of that, however, has anything to do with the proper understanding of the Fourth Amendment's proscription against unreasonable searches and seizures. Whatever rule of police conduct we derive from that provision must be just as applicable to a soccer mom taking the neighborhood children to practice as it is to habitual drunk drivers like Mr. Smith. Indeed, the rule we announce today would probably benefit from considering how it would apply in a legally identical but less emotionally-fraught situation.

¶56 So let's consider the soccer mom, Mrs. Brown. Her automobile is in the shop for maintenance, so Mrs. Jones (Mrs. Brown's neighbor and best friend) lent her the family's minivan. While Mrs. Brown is en route to soccer practice with a vehicle full of children, Officer Doe runs the plates and discovers the registered owner, Mr. Jones, has a suspended driver's license. Believing Mr. Jones is driving the minivan, he pulls it over. Upon approaching the driver's window, he realizes his mistake. But instead of apologizing for his interference with Mrs. Brown's liberty, the following conversation takes place:

> "Good afternoon, ma'am," said Officer Doe. "I pulled you over because I thought you were Mr. Jones. Obviously, I couldn't be more wrong. You needn't be alarmed——I don't believe you have broken any laws, nor does it appear you are contemplating doing so."

> "Oh," replied Mrs. Brown, somewhat disconcerted. "Just so I understand, you presently have no

2

reasonable suspicion to believe I have done anything wrong?"

"That is correct, ma'am."

"Then I may leave?" Mrs. Brown inquired.

"Actually, no," said Officer Doe. "You see, I'm curious about a few things. I want to know whether you have your driver's license with you. I'm also curious about whether it is valid, and whether there are any warrants for your arrest, or if there are any other reasons law enforcement might be interested in you."

"Please understand that I have no reason to believe you don't have a valid driver's license with you, or that law enforcement has any reason to be interested in you," Officer Doe continued. "And, of course, this has absolutely nothing to do with the reason I mistakenly pulled you over in the first place. However, a new Wisconsin Supreme Court decision, State v. Smith, says I can compel you to remain here until I finish satisfying my curiosity on these subjects."

¶57 That's enough of a vignette for the analysis. But it's important to note that this is not the full extent of the intrusion Officer Doe could command under these entirely innocent circumstances. If our decision today is correct, he could also have his narcotics-detection dog sniff the perimeter of the automobile to see if it would alert for the presence of illegal substances while awaiting the report on Mrs. Brown.[2] And he could order Mrs. Brown out of the minivan.[3] He could even order all of the children to stand along the roadside while he

---

[2] Illinois v. Caballes, 543 U.S. 405, 409 (2005).

[3] Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (per curiam).

3

completed his "incidental" questioning.[4] His authority to do all of this comes not from anything Mrs. Brown did, but from a mistake of Officer Doe's own making.[5]

II

¶58 This case requires us to identify the point at which the Fourth Amendment says a traffic stop must end. Is it when the purpose for initiating the stop is satisfied, or may a police officer continue the seizure to pursue other objectives? That is, must Officer Doe end Mrs. Brown's seizure when he discovers she is not Mr. Jones, or may he maintain the seizure to ask questions that have no connection to a reasonable suspicion of wrongdoing?

¶59 In giving our imprimatur to the latter, we erred, and significantly so. In adopting the constitutionally-unique concept of a "dual mission" traffic stop, we created a mission

---

[4] See Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609, 1615 (2015) (citing Mimms, 434 U.S. at 110-11 (no Fourth Amendment violation occurs where an officer orders "a driver, already lawfully stopped, to exit the vehicle") and Maryland v. Wilson, 519 U.S. 408, 413-15 (1997) (an officer may require passengers to exit a vehicle lawfully stopped for a traffic violation).

[5] The court says my hypothetical is a strawman. Majority op., ¶32 n.18. A strawman is a debate technique in which one participant pursues a rhetorical advantage by positing and refuting an argument the other participant didn't make. All I have done with this vignette is remove the elements that make Mr. Smith an unsympathetic character and replace them with elements that make the subject of the seizure neutral or sympathetic——elements, that is, that should not affect our analysis. Because the court has identified no constitutionally-significant difference between Mrs. Brown and Mr. Smith, I disagree with its conclusion that this is a strawman.

that allows a police officer to seize an individual without any reasonable suspicion of wrongdoing. And we took this ground-breaking step based largely on a "signal" we discerned from the vacation of the Cummings I[6] judgment by the United States Supreme Court.

A

¶60 Let's start with this——we should never countenance a traffic stop "mission" that is not tied to the Constitution. Power bristles at restraint, which is why we chain it firmly to constitutional anchor points. That is true whether the exercise of power involves the taking of personal property for public use, or inhibiting speech or publications, or the possession of arms, or conducting a traffic stop. We may disagree about the length of the chain, but we have always agreed that the Constitution must hold its anchor. Until today. Today we have dual mission traffic stops in which one mission is tethered to the Fourth Amendment and the other is not.

¶61 The first mission we describe in our opinion is the conventional one, the one which we have always understood to be inexorably linked to the purpose for the traffic stop, and thus to the Constitution. Notwithstanding our suggestion to the contrary, Rodriguez didn't say a single word from which we may infer the existence of any other mission. It started with the

---

[6] Like the majority, I will refer to People v. Cummings, 6 N.E.3d 725 (Ill. 2014), vacated, 135 S. Ct. 1892 (2015), as "Cummings I." I will likewise refer to People v. Cummings, 46 N.E.3d 248 (Ill. 2016) as "Cummings II."

5

broad observation that "[l]ike a Terry[7] stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'——to address the traffic violation that warranted the stop, . . . and attend to related safety concerns[.]" Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609, 1614 (2015) (citations omitted). And it recognized that "'[t]he scope of the detention must be carefully tailored to its underlying justification.'" See id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)). The underlying justification that defines the scope of the detention is the event that caused the officer to initiate the stop: "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose." Rodriguez, 135 S. Ct. at 1614 (internal marks and citation omitted). From this the Rodriguez Court concluded that the authority for a traffic stop cannot outlast its purpose: "Authority for the seizure thus ends when tasks tied to the traffic infraction are——or reasonably should have been—— completed." Id. Most importantly to our decision today, Rodriguez confirmed that even if a seizure was constitutional when it began, it can lose this status if it continues after the purpose for the stop has been satisfied. "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." Id. at 1614-15 (quoting Illinois v. Caballes, 543

---

[7] Terry v. Ohio, 392 U.S. 1 (1968).

6

U.S. 405, 407 (2005)). Everything Rodriguez said about the traffic mission——everything——describes it in terms of the singular mission we have always ascribed to a valid traffic stop, to wit, the investigation of an officer's reasonable suspicion of wrongdoing. As discussed at length, infra, "officer safety" and "the usual inquiries" have always been incidents to the purpose of the traffic stop, and Rodriguez said not a single word to the contrary.

¶62 And everything Rodriguez said about the constraining chain refers back to the constitutional anchor: Reasonable suspicion of wrongdoing. That, and that alone, is what defines the purpose of the stop. That purpose, in turn, defines "the tolerable duration of police inquiries." And the tolerable duration of police inquiries defines, in its own turn, the uttermost extent of the authority to seize a person. If the seizure goes beyond that, the police are on forbidden ground. Link by link by link, courts test the soundness of the connection between the constitutional anchor and the exercise of power. This has been the state of the law for long enough to consider it settled. Inasmuch as Rodriguez did nothing but recite these principles, we can safely conclude it hasn't disturbed the chain's continued integrity. And nothing in that recitation of well-established principles hints at the existence of a companion mission.

¶63 The second mission, the one we created today, breaks the link to the constitutional anchor point. This mission is triggered by a constitutional traffic stop, but after its

7

genesis it lives separately and apart from the purpose of the stop and, hence, its constitutional limits.  We called this second mission into existence by promoting the "usual inquiries,"[8] which used to occupy the lowly office of incidents to a traffic stop, all the way up to a rank of equal dignity with the purpose of the traffic stop itself.

¶64 Rodriguez referred to these usual inquiries as "incident to the traffic stop."  135 S. Ct. at 1615 (citation, brackets, and internal quotation marks omitted).  So did Caballes, in which the court observed that "the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop."  543 U.S. at 408; see also Berkemer v. McCarty, 468 U.S. 420, 439 (1984) ("Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.").

¶65 As "incidents" to a traffic stop, the usual inquiries are logically and constitutionally subordinate to the purpose of the stop.  An incident does not exist on the same plane as its premise.  That is true as a matter of definition.  An incident is "something dependent upon, appertaining or subordinate to, or accompanying something else of greater or principal importance." Incident, Webster's Third New International Dictionary (1986).

---

[8] The usual inquiries, of course, refer to a police officer's request to see a person's driver's license and proof of registration and insurance.

8

Because the usual inquiries, according to Rodriguez and Caballes, are incidents to a traffic stop, they can have no independent existence. In the world of logic, that's what it means to be dependent on something. That's why a seizure that begins with a constitutional basis can become unconstitutional: "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." Rodriguez, 135 S. Ct. at 1614-15 (quoting Caballes, 543 U.S. at 407).

¶66 Therefore, by main force of precedent and logic, the usual inquiries cannot be made after the purpose for the traffic stop——investigation of a reasonable suspicion of wrongdoing——no longer exists. The usual inquiries are thereby subjected to constitutional restraint, but only because they are subordinate to the purpose of the traffic stop, which is textually bound to the Fourth Amendment.

¶67 That is why we had to give the usual inquiries a promotion. As mere incidents they can have no existence beyond the purpose of the traffic stop. If Officer Doe is to authoritatively maintain Mrs. Brown's seizure after the dissipation of reasonable suspicion (the constitutional anchor point), the usual inquiries must be more than incidents. We accomplished the promotion with some clever melding of our voice with Rodriguez. We said that Rodriguez "concluded that asking for identification is an ordinary inquiry that is related to the purpose of a lawful stop as part of its dual mission and the stop 'may last no longer than is necessary to effectuate that

9

purpose.'" Majority op., ¶10 n.9 (quoting Rodriguez, 135 S. Ct. at 1614-15). Placing "dual mission" in the sentence where we did suggests that Rodriguez says the "purpose" of the stop includes both the traffic infraction and the desire to make the ordinary inquiries. Notwithstanding our voice-melding, however, Rodriguez still says the purpose of the stop is to address the traffic infraction.

¶68 With this promotion from "incident" to parity with the "purpose of the traffic stop," we freed the usual inquiries from their constitutional anchor point. We observed that "[w]hen Gonzalez saw the driver of the stopped car was a man, the first part of the mission ended." Majority op., ¶20. That is to say, the mission anchored in the Fourth Amendment ended. But because of the promotion, Officer Gonzalez didn't need to end the traffic stop: "The second mission of the traffic stop, however, had not been performed——checking the driver's license, registration, and insurance." Id. So we concluded that "[t]he mission of the lawful traffic stop did not end when reasonable suspicion dissipated because at that moment, the sergeant had not completed the ordinary inquiries of checking Smith's license, registration, and insurance." Majority op., ¶21. Et voilà: The advent of a traffic mission that allows a police officer to seize a person with no reasonable suspicion of wrongdoing whatsoever.

¶69 This should shock us. The "reasonable suspicion" requirement is not an archaic formula to which we give rote obeisance. It is, instead, the only textual link to the Fourth

10

Amendment's promise that we shall be free of "unreasonable" seizures. This is the stuff of our deepest bedrock principles: "[A person] may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." Royer, 460 U.S. at 498. Courts have spent decades fine-tuning what this principle means in the context of traffic stops. They have scrupled over, for just a few examples, whether the officer may require drivers to exit their vehicles,[9] or make passengers exit a vehicle,[10] or request permission to perform a pat-down search,[11] or ask questions unrelated to the traffic stop,[12] or conduct a canine sniff,[13] or extend the stop based on discoveries made while reasonable suspicion exists.[14] We went through this very exercise just last term, when we said:

> [W]e draw the line between traffic stops of proper duration and those that extend into unconstitutional territory according to functional considerations. . . . Generally speaking, an officer is on the proper side of the line so long as the incidents necessary to carry out the purpose of the traffic stop have not been completed, and the officer has not unnecessarily delayed the performance of those incidents. . . . He steps across that line (again speaking generally) when he maintains the seizure

---

[9] Mimms, 434 U.S. 106.

[10] Wilson, 519 U.S. 408 (1997).

[11] Arizona v. Johnson, 555 U.S. 323 (2009).

[12] Id.

[13] Rodriguez, 135 S. Ct. 1609; Caballes, 543 U.S. 405.

[14] State v. Betow, 226 Wis. 2d 90, 593 N.W.2d 499 (Ct. App. 1999).

11

> after he has completed all the necessary functions attendant on the traffic stop.

State v. Floyd, 2017 WI 78, ¶22, 377 Wis. 2d 394, 898 N.W.2d 560 (internal citations omitted; emphasis added). In all of this, the courts microscopically examined the purpose of the stop so that they could identify the point at which it must end.

¶70 Identifying the end point of the second mission requires no such fastidiousness. This mission is not based on "reasonable, objective grounds" to believe legal mischief is afoot. Until today, those grounds had always been the constitutional anchor to which we tethered the exercise of an officer's power during a traffic stop. And it is the anchor we now discard. This mission has no textual link to the Fourth Amendment, so our new "usual inquiries" jurisprudence sets us at odds with Royer (and the rest of the Fourth Amendment "seizure" canon): The police may detain a person without "reasonable, objective grounds" for doing so.

¶71 This frees traffic stops from constitutionally-defined limitations on at least two dimensions——length and content. In the pre-Smith world, the duration of the stop was subject to an externally imposed limitation——it could last no longer than necessary to investigate the officer's reasonable suspicion of wrongdoing. The second mission has no such limitation. So how long may it last? Well, we said "the 'ordinary inquiries,' which are related in scope to the purpose of a traffic stop, must be executed within the time it should have reasonably taken to complete them." Majority op., ¶2. In other words, the inquiries must be executed in the time it takes to execute them.

12

We also said that <u>Rodriguez</u> "signaled that 'ordinary inquiries' remain reasonable for the duration of an otherwise lawful stop." Majority op., ¶19.[15] Which is a different way of saying the same thing. One of the problems with defining an activity's lawful boundary in terms of how long the activity lasts is that it is not possible to cross the boundary. Ever. That's the "limit" we set today on the second part of our brand new dual mission.

¶72 The reason we have traditionally required a constitutional anchor point is so that we may have a boundary that is <u>not</u> self-referential. That is, we tie the duration of the traffic stop to its purpose, and then we tie the purpose to the reasonable suspicion that inspired the stop, and then we tie the reasonable suspicion to the Fourth Amendment's text by observing that it prevents <u>un</u>reasonable seizures. Thus, the temporal aspect of the seizure had a constitutional anchor and limit that was not self-referential. That's part of what we lose today. Because the usual inquiries no longer require the existence of any reasonable suspicion of wrongdoing, there is no

---

[15] The meaning of this statement is not entirely clear. On its face, its reference to an "otherwise lawful stop" seems to undermine (in the space of three words) the entire rationale of the opinion. The only "otherwise" about the lawful duration of the traffic stop was the existence of reasonable suspicion, which everyone acknowledges ran out before the officer engaged in the usual inquiries. That would mean the inquiries in this case were extra-constitutional. The other potential reading of the statement makes it appear we are defining the lawful duration of the stop in terms of how long it takes to conduct the inquiries. That doesn't help at all. One can't measure something by reference to itself. If someone asks after the height of our Capitol and we say it is one Capitol high, we have been perfectly accurate while conveying exactly no information.

13

link between them and the Fourth Amendment. So they may last as long as they last. We may eventually encounter a case in which the amount of time the officer took to make the ordinary inquiries will make us uncomfortable. But when we try to explain why the seizure lasted too long, we'll find that we have put our constitutional measuring stick beyond our reach. It is not immediately apparent what will take its place.

¶73 The same is true with respect to the contents of the "usual inquiries." These aren't spelled out in the Constitution, and we've not given much attention to their content because an officer may question drivers even on unrelated subjects so long as they do not extend the traffic stop. See Rodriguez, 135 S. Ct. at 1614-15. The Supreme Court explained that the usual inquiries are justifiable "incidents" of a traffic stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. at 1615. As incidents, there was an external limitation on how far the police could go in "enforc[ing] the traffic code" during a traffic stop, to wit, the amount of time within which there was reasonable suspicion of wrongdoing.

¶74 Because we have elevated the usual inquiries beyond the status of incidents, however, there is no longer any external limitation on how far they can go. If demanding presentation of a driver's license during a traffic stop is constitutionally permissible because it "serves the same objective as enforcement of the traffic code," then it must

14

certainly be true that ascertaining compliance with the actual traffic code can be no less constitutional.

¶75 Our opinion teaches that the traffic stop does not end until inquiries related to the safe and responsible operation of the vehicle have been conducted. Enterprising officers may teach us, in turn, that there is a whole lot more to the safe and responsible operation of a vehicle than a driver's license and proof of registration and insurance. See, e.g., Wis. Stat. § 347.10(2) (describing the required performance of headlights); Wis. Stat. § 347.13 (describing the required performance of taillights); Wis. Stat. § 347.39(2) (describing required exhaust system performance and safety requirements); Wis. Stat. § 347.36(1) (describing required brake system performance); Wis. Stat. § 347.38(1) (describing the horn's required performance); Wis. Stat. § 347.40 (describing the required performance of rear-view mirrors). Each of these traffic-code provisions is at least as closely related to the safe and responsible operation of a vehicle as possession of a driver's license.

¶76 Perhaps the court will say that inquiring into these aspects of the safe and responsible operation of a vehicle is not part of what we call "usual." Which would be both true and irrelevant. The "usual inquiries" are usual not because the Constitution says they are, but because the judiciary says they are. The only limitation any court has ever placed on them is that they must be related to the safe and responsible operation of vehicles, and that they be incidents to the traffic stop. We've removed the latter limitation, so we are free to give the

"usual" label to as many inquiries as we wish, so long as they comply with the "safe and responsible operation" boundary.

¶77 The court says this should present no worries because the usual inquiries are subject to the constraint of "constitutional reasonableness." Majority op., ¶32 n.18. I had thought this type of reasonableness consisted of "reasonable" suspicion of wrongdoing. Our opinion today says that's wrong (or at least incomplete), so it would have been helpful if we had described the parameters of this constraint and identified its reference point in the Constitution. The police and our courts will need this guidance.

B

¶78 Authorizing a police officer to seize an individual when there is no reasonable suspicion of wrongdoing is enough to send a tremor through the foundation of the Fourth Amendment. If the United States Supreme Court had explicitly commanded such a result, we would be justified in questioning whether the Fourth Amendment's terms really are congruent with Article I section 11 of the Wisconsin Constitution.[16] But we aren't responding to an explicit command here——we're reading a "signal."

---

[16] "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Wis. Const. art. I, § 11.

16

¶79 Our opinion carefully avoids an independent analysis of whether Rodriguez is truly responsible for this seismic event. Instead, we focus on environmental factors at the time of the Court's decision: "Before applying Rodriguez to the particular circumstances in Smith's case, we first examine the conditions surrounding the Supreme Court's holding in Rodriguez." Majority op., ¶16. One of the conditions was the Supreme Court's treatment of an Illinois Supreme Court case involving the same issue we are addressing. See majority op., ¶¶16-19; see also People v. Cummings, 6 N.E.3d 725 (Ill. 2014), vacated, 135 S. Ct. 1892 (2015). We concluded that "[w]hen the Supreme Court vacated the judgment in Cummings I and remanded the case to the Illinois Supreme Court for further consideration in light of Rodriguez it signaled that 'ordinary inquiries' remain reasonable for the duration of an otherwise lawful stop." Majority op., ¶19.[17] And then we adopted the Cummings II analysis of Rodriguez as our own. Id. ("The Illinois Supreme Court's interpretation of Rodriguez in Cummings II is correct.").

¶80 Armed with the Rodriguez "signal" and Cummings II, we decided the merits of this case. That puts a premium on the incisiveness of the Cummings II opinion. But it appears the Illinois Supreme Court also relied on signaling. In relevant part, the court said:

---

[17] This statement is substantively problematic apart from the importance it attaches to a Supreme Court "signal." See supra note 15.

> The seizure's mission consists of the purpose of the stop——in Rodriguez, traffic enforcement——and "related safety concerns." Those related safety concerns include "'ordinary inquiries incident to [the traffic] stop,'" and typically "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."

People v. Cummings, 46 N.E.3d 248, 251 (Ill. 2016) (citations omitted). The court concluded that the traffic stop may continue even without the existence of reasonable suspicion of wrongdoing because "[t]he interest in officer safety permits a driver's license request of a driver lawfully stopped." Id. at 253.

¶81 The Cummings II analysis is an unabashed bootstrap. Between Officer Doe and Mrs. Brown, it would sound something like this:

> "Why are you continuing my seizure?" Mrs. Brown asked.

> "To engage in the usual inquiries," replied Officer Doe.

> "But why do you need to engage in the usual inquiries?" persisted Mrs. Brown.

> "To ensure my safety," Officer Doe patiently explained.

> "Why is your safety an issue?"

> "Because I'm continuing your seizure, of course," concluded Officer Doe.

¶82 Is it really necessary to point out that concerns over the officer's safety would vanish if he ended the seizure? Or that ending the seizure would make the usual inquiries moot?

¶83 So, based on nothing more than a Supreme Court signal and the Illinois Supreme Court's interpretation of that signal,

18

we decided that the Fourth Amendment permits the seizure of an individual without reasonable suspicion of wrongdoing. That's an awfully momentous decision to base on a signal.

### III

¶84 We ask, semi-rhetorically: "But in these particular circumstances, does the Fourth Amendment require a police officer to freeze, do an about-face, and walk away?" Majority op., ¶15. The answer is definitively "no." But not for the reasons we gave, and certainly not with the same consequences.

¶85 The real reason the answer is "no" is because the officer deprived Mr. Smith of his liberty and had no continuing justification for withholding that liberty from him. Once seized by a police officer during a traffic stop, a driver may not leave until the traffic stop is finished. See Wis. Stat. § 346.04(2t) ("No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits."); see also, Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."). So, in these circumstances, the officer's clear, unequivocal, mandatory duty was to approach Mr. Smith and inform him he was free to

leave.[18]   Of course, if the officer develops a reasonable suspicion of wrongdoing during this brief interaction, he may proceed with the seizure just as if the reasonable suspicion had never lapsed.

¶86 If our focus is on whether it was a good thing to catch Mr. Smith, then this is a galling result, given what we know about his state of inebriation when Officer Gonzalez seized him.  But the Constitution is not a Dorian Gray-like bargain in which we accept the beauty of apprehending Mr. Smith in exchange for the ugliness of Mrs. Brown's unreasonable seizure. The Constitution's instruction on this question is categorical:  A person may not be "detained even momentarily without reasonable, objective grounds for doing so."  And because it is categorical,

---

[18] The court says my analysis would not allow the officer to excuse Mr. Smith because I eschew "any further contact with the driver . . . past the moment reasonable suspicion dissipates." Majority op., ¶15 n.12.  I don't think that is so.  Every traffic stop must eventually end, and it ends when the officer tells the motorist he is free to go.  Johnson, 555 U.S. at 333. The duty to release the motorist stems from the constitutional mandate that a person "may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." Florida v. Royer, 460 U.S. 491, 498 (1983).  Actualizing that mandate requires the officer to approach the motorist to tell him the seizure is over.  Requiring production of a driver's license, and proof of registration and insurance, however, does nothing to further that task.

20

it applies even when it means we don't catch Mr. Smith and his like.[19]

¶87 It is important, essential even, to consider how our decision impacts Mrs. Brown. Neither she nor anyone like her will ever come before this court, for she has done nothing wrong and, consequently, will never be party to a case we can review. But we have, nonetheless, decided how she may be treated. So Mrs. Brown may spend an evening fielding calls from irate parents asking why their children were lined up along the roadside while a narcotics-detection dog searched the minivan. After the last call, perhaps she will pull out her pocket Constitution and puzzle over why the promise of freedom from unreasonable seizures means she can be seized for no reason at all. Because I can't explain that to her, I respectfully dissent.

¶88 I am authorized to state that Justices SHIRLEY S. ABRAHAMSON and ANN WALSH BRADLEY join this dissent.

---

[19] To illustrate why my analysis is untenable, the court proposes an alternate scenario in which the apparently innocent minivan driver is actually a sex trafficker. Majority op., ¶32 n.18. Conducting the usual inquiries in those circumstances, it says, would have revealed there was criminal behavior afoot. True enough. But doesn't that just prove my point? The court's scenario could be read as favoring suspicion-free police investigations because of the results they might produce. But we don't measure the constitutionality of a search in terms of its effectiveness in revealing hidden malefaction. According to Royer, we measure it in terms of reasonable suspicion of wrongdoing. If the investigation is not necessary to address the purpose of the stop, it may last only as long as there is reasonable suspicion. Johnson, 555 U.S. at 333. Suspicion-free investigations like the one the court described might be very productive, but that doesn't make them constitutional.

21